CLEVELAND & B. TRANSIT CO. v. INSURANCE CO. OF NORTH
AMERICA.

(District Court, S. D. New York.   April 15, 1902.)

MARINE INSURANCE—CONSTRUCTION OF POLICY—INCHMAREE CLAUSE.
    A time policy of marine insurance on a new lake steamboat contained the Inchmaree clause, providing, inter alia:   "This insurance also specially to cover loss of, or damage to, the hull or machinery, * * * through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners." The vessel was constructed by builders of the best reputation, under competent supervision, and no expense was spared by the owners to make her reasonably perfect.   At the end of one of her first voyages the engine bedplate was found to be cracked, and it subsequently became necessary to replace it.   The injury was due to a latent defect in the casting, not discoverable until it was broken up, which the evidence tended to

show was brought to the surface, fracturing the plate, by an unusual shock to the engine caused by a small quantity of water getting into the cylinders. *Held*, that such defect, while it existed when the policy was written, was not one which rendered the vessel unseaworthy in the ordinary sense, to prevent the attaching of the policy, and that under its provisions the insurer was liable for the damage.[1]

In Admiralty. Suit on policy of marine insurance.

Wing, Putnam & Burlingham, for libelant.

Black & Kneeland, for respondent.

ADAMS, District Judge. This is an action brought to recover a loss under a marine insurance policy dated May 13, 1896, issued by the respondent to the libelant on its steamboat City of Buffalo and covering the period of one year from its date. The risk was for $25,-000, on a valuation of $200,000. The policy, inter alia, provided:

"This insurance also specially to cover loss of, or damage to the hull or machinery through the negligence of master, mariners, engineers or pilots, or through explosions, bursting of boilers, breaking of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship, or any of them, or by the manager. * * *

"General average, and all claims hereunder, payable as per American Lake Adjustment, if so claimed."

It was originally alleged by the libelant that on or about the 19th day of May, 1896, as the steamboat was proceeding from Cleveland to Buffalo a crack was discovered in the bedplate of the engine; that on arrival at Buffalo temporary repairs were made and later, at the close of the season, the vessel was taken to Detroit, where upon a survey and examination made after taking the engine apart, it was found and determined that the bedplate had fractured because of a latent defect which could not be discovered by any practicable means short of breaking up the casting; that the libelant duly proceeded to repair the damage and replace the broken bedplate and thereafter made a demand upon the respondent for $1,037.68 which it appeared was due per American Lake Adjustment under all the policies in force upon the vessel; that the respondent refused to pay the said demand.

The respondent admitted the demand and refusal but denied any liability under the terms of the policy and the facts of the case, and specially pleaded that any crack or damage to the bedplate of the engine was due to its defective condition, which existed at and prior to the inception of the risk and that by reason thereof the vessel was unseaworthy at the time and the policy never attached.

After the case was submitted for decision, it appeared that certain proofs on the part of the libelant with respect to water having been admitted to the cylinders while the steamer was in service, causing an unusual shock to the engines, were in the case but had not been pleaded nor controverted. An opportunity was then given counsel to supply any omissions or further testimony in the matter but after consideration they concluded to let the proofs stand as they were.

---

[1] Marine insurance, see notes to The Dunbritton, 19 C. C. A. 465; Pacific Mail Steamship Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357.

I thereupon granted a motion on the part of the libelant to amend the libel as follows:

"Fourth. After the said policy had attached, and in the afternoon of May 13, 1896, the City of Buffalo made a trial trip near Detroit, and began running on May 14th in the service between the ports of Cleveland and Buffalo. Between that day and May 19th her boilers had primed, admitting water into the cylinders, which caused a shock and overstrain to the engines and to the cylinder supports. On the 19th day of May, 1896, while said boat was proceeding from Cleveland to Buffalo, or after arrival there, a crack was discovered in the bedplate of the engine underneath the low-pressure cylinder, followed afterwards by two other cracks extending towards the sides of the bedplate. Temporary repairs were made, and later, at the close of the season, the boat was taken to Detroit, where, upon a survey and examination. made after breaking up the bedplate, it was found and determined that t..e bedplate had fractured because of a latent defect in the casting, known as a 'cold shut,' which could not be discovered by any practicable means short of breaking up the casting. The libelant is informed and believes that this shock by water in the cylinders brought out this interior defect, and then caused it to be outwardly manifested in the surface cracks aforesaid."

The facts in the case appear to be that the steamboat was built during the year 1895–96, and was delivered to the libelant at Detroit on the 5th day of May, 1896. After spending the intervening time fitting out, she went into commission on the 14th of May and on that day sailed for Cleveland, where she arrived in the evening and proceeded immediately to Buffalo, where she arrived the next morning. She then made two trips between Buffalo and Cleveland and after arriving at Buffalo May 19th, at the end of the second trip, the engineer discovered a crack in the under side of the bedplate of the engine at about the middle of the casting and at the fore end of the channel way leading from the condenser to the air pump. It was detected while the vessel was at rest at Buffalo. The engineer in making his daily examination heard some water running down, and went in under the bedplate, in the middle of which he found a very fine hair crack, 6 or 8 inches long, about a foot or 18 inches from the high-pressure cylinder on the port side of the ship. Experts were at once called in and it was concluded that the injury was a permanent one, rendering the substitution of a new bedplate necessary, but, to avoid the loss of time incident to a change at that important time of the year, it was determined that temporary repairs could be made which would carry the boat through the season. A patch was put over the crack to make it air and water tight and short girders were put under the patch for the purpose of strengthening the bedplate. The vessel then pursued her business but new cracks developed within a few weeks of the first one and additional girders, with strengthening bars, were put in, running fore and aft the whole length of the bedplate. The vessel ran through the season in this way and was laid up at Detroit for the winter of 1896–97. In March, 1897, a survey was called on the vessel for the purpose of ascertaining the damage sustained through the cracking of the bedplate and it was recommended that a new one be obtained, which was done. The old one was taken out and broken up for the purpose of determining the cause of the cracks. It was found that in the casting of the bed-

plate there had occurred what is known as a "cold shut," which is described by one of the experts as being made "by two currents of molten metal coming to a place in the mold—if the molten metal of the two currents is of equal temperature, they will fuse and become one current of equal consistency, if I may use that word. Sometimes it so happens that a current is stopped perhaps at a place in the mold, chilling it slightly; when the current coming from the other direction reaches that point, the fusion of the two currents is not complete; forming in that case what is commonly known in technical words as a cold shut."

It was testified that cold shuts occasionally appear in castings though there was no evidence of one having been before found in a bedplate and that they may be caused by some negligence in the casting through failure to provide sufficient orifices into which the metal is to be poured, or to have enough metal sufficiently heated, on hand to make the casting. It is probable that something of the kind happened here, because there can be no doubt that a defect existed in the casting from the beginning and that it was at least a partial cause of the subsequent condition of the bedplate, requiring its replacement. Nor can there be any doubt that the defect was latent and while it existed when the risk was accepted by the underwriters that it might never have manifested itself at the surface without some supervening cause. The weather was fine during the few trips the boat made prior to the discovery of the crack and nothing occurred out of the ordinary after the vessel went into service to cause it to develop, except that the engines were under unusual pressure at one time and the boilers then "foamed a little and we got a little water in the cylinder," as was stated by the engineer. Experts testified that such an entry of water into the cylinders would produce an overstrain or shock upon the whole engine very much greater than the ordinary vibrations, and it is argued by the libelant that as the cylinder was over the cold shut, which was in the weakest part of the bedplate, the shock brought out the weakness causing it to extend to the under surface and become patent in the fine crack seen May 19th. While the testimony is meager with respect to the shock to the engine, it must be regarded as established that something out of the ordinary did occur in the way of a shock and I think that the libelant was not required to go further in order to show the cause of the water getting in the cylinder.

There is further expert testimony tending to show that the subsequent cracks were the result of the development of the cold shut through the first crack.

Upon these facts, the question arises whether the respondent is liable under the clause of the policy quoted.

This clause was unknown in marine insurance policies prior to the decision of the House of Lords in 1887, in Insurance Co. v. Hamilton, 12 App. Cas. 484. That was an action on a time policy on the steamship Inchmaree, which provided with respect to the risks insured against:

"And touching the adventures and perils which the capital stock and funds of the said company are made liable unto by this insurance, they are

of the seas, men-of-war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes, and people of what nation, condition, or quality soever, barratry of the master and mariners, and of all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the aforesaid subject-matter of this insurance, or any part thereof."

The facts were stated in the opinion as follows:

"On the 2d of March, 1884, the Inchmaree was at anchor off Diamond Island, awaiting orders, and for the purposes of the voyage it was necessary to pump up the main boilers, by means of a donkey pump and engine, in the usual way. A pipe led from the donkey pump to the boilers, and at its junction with one of the boilers there was a check valve, capable of being opened or closed by a screw, which ought to have been kept open and clear when the boilers were being pumped up. This valve had either been left closed or had become salted up when the donkey pump was set to work off Diamond Island, so that the water could not pass into the boiler. The consequence was, that when the donkey pump was set to work the pipes and water chamber in the donkey pump, and the air chamber therein, became overcharged, and the water was forced up into the air chamber, which, in consequence split, and the pump was thereby damaged."

"It was admitted, for the purposes of the case, that the check valve was either allowed to remain closed or become salted up, by the negligence of one of the engineers, or was accidentally salted up without being noticed, though reasonable care was taken by the engineers. It was also admitted that the closing or salting up, and accident, were not due to ordinary wear and tear."

It was there held, reversing the Court of Appeal, that the loss, though accidental or due to the negligence of the engineer and not due to the ordinary wear and tear, did not fall under the policy, though within the words thereof in their widest sense, because of the rules of construction, (1) that words, however general may be limited with respect to the subject-matter in relation to which they are used, and (2) that general words may be restricted to the same genus as the specific words that precede them, and, further, because of a third consideration, that where the same words have for many years received a judicial construction, it is reasonable to suppose that they would be understood in the accepted sense by the parties using them and the courts would resort to such sense in reaching the meaning of the parties. Applying these rules to the case in hand, in connection with established authorities on the law of marine insurance, and in view of the fact that the parties had used the old familiar insurance words relating to marine risks, the court concluded that it was not the intention of the parties that the insurance should cover losses not ejusdem generis with the ordinary perils insured against and found that there was nothing in the contract to enlarge the ordinary words so as to cover perils whose only connection with the sea was that they arose from machinery which gave motive power to ships.

The immediate practical consequence of this decision in England was the invention of the special clause in question here, subsequently called the Inchmaree clause, the use of which has become universal there in policies on steamers, particularly in time policies. Gow, Ins. 119; 2 Arn. Ins. (7th Ed.) p. 973, note. The clause was evident-

ly designed to cover, at least, the kind of a risk which was regarded by the House of Lords as not included in the policy in the Inchmaree Case (Insurance Co. v. Hamilton). In that case the Court of Appeal, Lord Esher dissenting, (17 Q. B. Div. 195, 203) adopted the language of Lord Selborne in West India & P. Tel. Co. v. Home & C. Marine Ins. Co., 6 Q. B. Div. 51, where he said:

"What the winds are to a sailing vessel, steam is to a steamer; and it is as reasonable that marine insurers should bear the risks incident to a navigation by that kind of power, whether from excess of pressure on the boiler, or from defect of safety valves, or from neglect or mismanagement, making that dangerous which otherwise would not be so, as that they should bear losses occasioned by excessive pressure of winds and defects or mismanagement of a ship's sails or tackle."

This case was expressly disapproved by the House of Lords in deciding the Inchmaree Case and it is reasonable to conclude that it was the intention of the designers of the clause to create a form of contract which would have the effect of reinstating the liability on the part of the underwriters existing under Lord Selborne's decision, which was followed in the reversed case.

It would seem that under the English rule, recovery would be allowed in a case of this kind, and when the origin of the clause is considered and its adoption in this country, without alteration in any particular, that a similar liability would follow, unless there is something in the policy of our law which would create a difference. It is urged by the respondent that as a matter of fact the vessel was unseaworthy when the policy issued and there can be no recovery for that reason, unless it appears that the parties intended to abrogate or modify the implied warranty of seaworthiness which the law prevailing here reads into the ordinary policies of marine insurance. Insurance Co. v. Smith, 124 U. S. 405, 427, 8 Sup. Ct. 534, 31 L. Ed. 497. I do not think it necessary to decide whether the clause has such effect because I find that the vessel was seaworthy in the ordinary sense. No pains or expense were spared to make her reasonably perfect. She was constructed, both with respect to hull and machinery, by builders of the best reputation under competent supervision. When the bedplate was completed it was subjected to the usual examination and tests to determine its fitness for the work it would be required to perform. Notwithstanding all proper precautions, a defect remained. It was not, however, incumbent on the assured to furnish a perfect vessel but merely one that was in a reasonably safe and proper condition to meet the ordinary contingencies of the business in which she was to engage. The fact of water getting into the cylinder was but a slight accident and indicates that the loss was principally due to the inherent weakness caused by the cold shut. Nevertheless, as I find that the policy attached, it seems clear that the loss is directly within its terms, providing that the insurance should cover loss or damage to the hull or machinery through any latent defect.

Decree for libelant for $1,037.68 with interest.