Salvatore **FERRANTE**, et al.,
Plaintiff,

v.

**DETROIT FIRE AND MARINE INSUR-
ANCE COMPANY**, et al.,
Defendant.

No. 14143–C.

United States District Court,
S. D. California, Central Division.

Oct. 20, 1954.

Arch E. Ekdale, Gordon P. Shallenberger and George E. Toner, San Pedro, Cal., for plaintiffs.

Derby, Cook, Quinby & Tweedt, San Francisco, Cal., Overton, Lyman, Prince & Vermille and Dan Brennan, Los Angeles, Cal., for defendants.

JAMES M. CARTER, District Judge.

This case presents a question of marine insurance and concerns the "Inchmaree" clause [1] usually appearing in American and English Marine insurance policies.

On June 1, 1951, Salvatore Ferrante was the owner and Master of a purse-seiner, the "Rosanna". The "Rosanna" was covered by a policy of marine insurance issued by the defendant for the period from August 22, 1950, to August 22, 1951, insuring the hull and machinery of the "Rosanna" against loss and damage from certain specified perils and causes in the amount of $52,500. Prior to the filing of the action, all of Ferrante's rights under the policy were assigned to the co-plaintiffs herein, Herbert W. Elander, Einar Jall and William R. Bird, doing business under the fictitious firm name of Western Engine Service Co. This company made the repairs on the "Rosanna" following the happenings hereinafter related.

The facts of the accident are related by Salvatore Ferrante, the owner and Master and W. D. Newby, Chief Engineer, contained in a surveyor's report.

"June 1, 1951. 12:00 noon. We were trolling along looking for fish when the exhaust stack gave out a heavy cloud of white smoke. I then checked my pyrometer for fire in exhaust boxes. The engine was slowly turning and I noticed vibration in the front end, so I immediately shut it off. As the motor stopped I heard a distinct thud and then started looking to see what the trouble was. I pulled side inspection plates on the engine and found the crankshaft broken through the back main bearing * * *"

The "Rosanna" was towed to San Pedro and the expense of the towing, $502.-64 is conceded by the pretrial stipulation to be a proper claim for the plaintiff. Repairs were made by the Western Engine Service Company, commencing June 6, 1951 and were completed July 27, 1951. The parties have agreed that the total cost of repairs amounted to $11,682.05. The evidence established that the cost of repairing the consequential damages done to the engine when the shaft broke amounted to $1,080.10 and that the balance of $10,601.95 represents the cost of replacing the broken shaft.

The surveyor's report also states: "It was found that a new crankshaft was not immediately available from the factory. A second-hand used shaft of the same type and model as original was located. It was accordingly checked between centers and found true * * *"

1. The clause was first inserted in Marine policies after a decision by the House of Lords, reversing the court of appeal in Thames & Mersey Marine Insurance Co. v. Hamilton Fraser & Co., 12 App.Cas. 484 (1887). The vessel involved was the S.S. "Inchmaree", hence the name appended to the clause.

The second-hand shaft and its testing and preparation for installation in the "Rosanna" amounted to $2,578.40; the new crankshaft would have cost $3,887, a difference or saving of $1,309.

Plaintiff sues for the following:

1. Towing charge, $502.64;

2. The cost of repairs on the engine, $11,682.05; and

3. The difference in value between the used crankshaft and the new crankshaft, $1,309.

There is a deductible provision in the policy of $600, the amount being deductible from the total claimed in (2) and (3) above, but not from the towing.

The policy provides that it is warranted free from particular average under 3%, which in this instance amounts to $1,575, namely 3% of the $52,500 shown on the policy face.[2]

The marine insurance policy sued upon, is like woman, "fearfully and wondrously wrought." It consists of nine additions or endorsements fastened to the top of a one-page marine policy. This policy is written in the archaic language of marine policies, similar to that referred to by the Supreme Court in the case of Calmar S. S. Co. v. Scott, 1953, 345 U.S. 427, at page 432, 73 S.Ct. 739, at page 742, 97 L.Ed. 1125, where the court said, "Construing such conglomerate provisions requires a skill not unlike that called for in the decipherment of obscure palimpsest texts. * * * nor have we any Elder Brethren of Trinity House to help us."

To the first policy sheet is attached an endorsement entitled, "American Hulls (Pacific) 1938, Rev. Nov. 1945," consisting of some twenty-four numbered paragraphs, plus additional matter listed as (a), (b) and (c) at the bottom thereof. Next is attached another endorsement entitled, "California Fishing Vessels, Endorsement No. 2 (Rev.) Nov. 1945-K." It provides that clauses 10, 11, 14, 15, 23, 24 and C are deemed to be deleted from the prior endorsement, "American Hulls." On top of these are attached seven additional endorsements not pertinent here.

In this hodge-podge we find certain provisions clearly and definitely stated. The policy sheet states: "This insurance is understood and agreed to be subject to English Law and Usage as to liability for and settlement of any and all claims."

Endorsement No. 1 states in (c): "Warranted to be subject to English Law and Usage as to liability for and settlement of any and all claims." However, endorsement No. 2 expressly deletes (c) above, from endorsement No. 1, but no reference is made to the policy sheet. It is assumed therefore that the foregoing warranty in the policy sheet remains untouched and that this case is governed by English Law and usage. This point need not be labored in that it does not appear that a different result would follow under American Law and usage.

Endorsement No. 1 in paragraph 10, contains what is generally termed the "Inchmaree" clause, but paragraph 10 is deleted from endorsement No. 1 by endorsement No. 2.

2. Paragraph 8 in the California Fishing Vessels Endorsement No. 2, briefly warrants that the policy is free from Particular Average under 3%. Interpreted, this means the insurer has no liability unless the damage in question exceeds 3% of the face of the policy. If the defendants are liable based on negligence of the Master or engineer for the total repair bill of $11,682.05, then this amount would be what is known as a Particular Average expense. Inasmuch as this expense in such instance exceeds the 3% warranty, the warranty would not limit plaintiffs' right of recovery. Should it be decided that the evidence does not bear out a finding of negligence and that under the "Inchmaree" clause the cost of replacing the broken shaft is excluded, then the warranty would become pertinent since in that instance the Particular Average expense would be limited to the so-called resulting damages in the sum of $1,080.10. Since the amount is less than 3% of the policy face, i. e. $1,575, plaintiffs would not be entitled to receive the $1,080.10 from the insurer.

However, endorsement No. 2 terminates our frustration in that it contains in paragraph 9, the "Inchmaree" clause with which we are here concerned.

"9. This insurance also specially to cover (subject to the average and deductible average warranties) loss of or damage to hull or machinery directly caused by the following:—

"Accidents in loading, discharging or handling cargo, or in bunkering or in taking in fuel;

"Explosions on shipboard or elsewhere;

"Bursting of boilers, breakage of shafts or any latent defect in the machinery or hull *(excluding, however, the cost and expense of repairing or renewing the defective part)*;

"Contact with aircraft;

"Negligence of Master, Charterers, Mariners, Engineers or Pilots;

"Provided such loss or damage has not resulted from want of due diligence by the Owners of the vessel, or any of them, or by the Managers. Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the vessel." (Exclusion phrase underlined.)

The breaking of shafts in vessels has been a fertile field for litigation. At the threshold we are met with a question of fact, and different results flow from different factual determinations. For example, the shaft may break from (1)

"negligence of Master, Charterers, Mariners, Engineers or Pilots" insured against in the "Inchmaree" clause, or from (2) "any latent defect in the machinery or hull" insured against in the clause. Obviously "machinery" includes the shaft. Or from (3) obsolescence, old age and wear and tear, or (4) other causes or combinations of causes.[3]

If the shaft breaks through negligence as specified in the clause, then it is clear that since negligence was a peril insured against, the cost of replacing the shaft and all resulting damage caused by the breakage, including the expense of removing and replacing the shaft[4] are properly recoverable.

If the shaft breaks because of a latent defect,[5] the latent defect is a peril insured against. The liability of the insurer is for "damage to hull or machinery directly caused by" this latent defect. The question of liability for the cost of renewing the shaft itself, and for the cost of removing and replacing the shaft, raise serious questions which we discuss hereafter.

If the shaft breaks from obsolescence, old age or ordinary wear and tear, such a peril is insured against. The liability of the insurer is for "loss or damage to hull or machinery directly caused by * * * breakage of shafts * * *" The same question arises as to liability for the cost of renewing the shaft itself and for the cost of removing and replacing the shaft.

At the trial, pictures of portions of the broken shaft were before the court.[6]

---

3. Other possible causes suggested are *fatigue* which in the absence of a latent defect would seem to fit in the class of obsolescence; tool marks causing fractures, which might or might not be latent defects; *shock, stranding,* etc.

4. The cost of removing and replacing the shaft is generally the major item of expense, often as here, far exceeding the costs of the new shaft and the total or other resulting damage.

5. A latent defect is a hidden defect and generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear. Schon v. James, La.App.1946, 28 So.2d 531, 533. The Bill, D.C.Md.1942,

47 F.Supp. 969, 978, affirmed, Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 145 F.2d 470. See Mellon v. Federal Ins. Co., D.C. N.Y.1926, 14 F.2d 997, 1002; Waterman S.S. Corp. v. U. S. Smelting, etc., Co., 5 Cir., 1946, 155 F.2d 687, 691, certiorari denied 329 U.S. 761, 67 S.Ct. 115, 91 L. Ed. 656; Borland v. Standard Marine Insurance Co., Ltd. (The Rensselaer), 125 Misc. 395, 211 N.Y.S. 348, 1925 A.M.C. 1116, 1119–1120; Mattson v. Connecticut Fire Ins. Co., D.C.Minn.1948, 80 F.Supp. 101, 106.

6. The underwriters, whose agents had possession of the broken shaft, disposed of it. It was not available to introduce into evidence.

Tests were made and there was conflicting expert testimony as to the cause of the break. There was evidence of other conditions and circumstances, such as the fact that the pistons and walls of the cylinders were scored, indicating overheating and freezing from expansion. The usual cause of such a condition is ineffective lubrication bringing about the over-heating and expansion and consequent binding or freezing. This would so increase the stress on the engine that, unless given attention it would result in stalling or breakage. This could have been averted by proper attention by the engineer, whose duty it was to give such attention. There was also expert testimony based on the happenings in question and the appearance of the shaft as to what an engineer would have seen and observed had he been using due care in the operation of the engine.

On examination of the evidence, we found no latent defect existed. Defendants' expert testimony on the subject of latent defects was unsatisfactory and the manufacturer's report contradicted this testimony. From the evidence we found that the shaft failure and entire engine damage was proximately caused by negligence of the engineer in failing properly to lubricate the engine, and in failing to observe the symptoms of inadequate or improper lubrication which were or should have been apparent to a competent engineer. If, as suggested by defendant, the engineer was not in the engine room, he was nonetheless negligent by his absence.

■ Since the shaft failure was occasioned by the negligence of the vessel's engineer, the plaintiffs are entitled to recover the cost of repairs, $11,682.05 less the policy deductible of $600. The particular average warranty of 3% does not become pertinent.

■ The court also found that the used crankshaft installed by the insured was an adequate replacement and was installed by the plaintiffs for their convenience. Plaintiffs therefore are not entitled to recover the saving thus effected in their costs of $1,309.

### The Original "Inchmaree" Clause.

■ If we are in error in our finding of negligence, then detailed analysis of the "Inchmaree" clause becomes pertinent. In order to place this case in a position where an appellate court could dispose of it on appeal and have the views of the trial court, for what they are worth, we proceed to analyze the "Inchmaree" clause. The specific query is whether the clause provides restitution of the cost of replacing a broken shaft without regard to the cause of that failure.

It appears from a review of the earlier decisions that the words in parentheses reading: "(*excluding*, however, the cost and expense of repairing or renewing the defective part)" were not written into the original form of the "Inchmaree" clause. In determining the meaning of the "Inchmaree" clause as previously written, the English courts [7] and at least one American court [8] have reached the conclusion that the clause did not insure against the breakage of a shaft in the absence of the operation of some other peril specified in the policy. The words "breakage of shafts" appearing in the mid portion of this clause were construed to spell out a marine peril. The breakage of a shaft establishes the peril but it does not simultaneously constitute damage to "hull or machinery" within the first portion of the clause.

### The "Inchmaree" Clause as amended.

There do not appear to be any recorded decisions construing the clause containing the exclusion above set forth.[9] We now consider it.

7. Oceanic Steamship Co. v. Faber [1906] 11 Commercial Cases 179; Scindia Steamships Limited v. The London Assurance [1936] 42 Commercial Cases 121; Hutchins Brothers v. The Royal Exchange Corporation [1911] 2 K.B. 398.

8. Borland v. Standard Marine Insurance Co., Ltd., 1925, 125 Misc. 395, 211 N.Y.S. 348, 1925 A.M.C. 1116.

9. Cleveland & Buffalo Transit Co. v. Insurance Co. of North America, D.C.N.Y. 1902, 115 F. 431, wherein recovery was

■ Plaintiffs contend for a construction that the cost of replacement of the shaft itself is covered under the terms of the "Inchmaree" clause because it was not a "defective part." It is clear that the phrase "(excluding however the cost and expense of repairing or renewing the defective part)" refers only to the part shown to have a latent defect. Plaintiffs argue, first, that the addition of the excluding clause has had the legal effect of excluding from coverage only the cost of repairs or renewal of parts having a latent defect and by necessary implication including cost of replacement of broken shafts, when such shafts are themselves free from latent defects. The argument, in effect, is that the "Inchmaree" clause, as it formerly existed and was interpreted by the English Law, has been broadened on the principle of "expressio unius exclusio alterius." Plaintiffs also contend that the exclusion clause, added in an effort to clarify coverage, has actually succeeded in causing an ambiguity; that such ambiguity in an insurance policy should be resolved against him who chose the ambiguous words, i. e., the insurer. Aschenbrenner v. United States Fidelity & Guaranty Co., 1934, 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137.

■■ We believe that the effect of the exclusion, reasonably construed, is to delete rather than to add coverage. It resolves any doubt whether the cost of repairing or renewing parts containing latent defects is covered. Reading the "Inchmaree" clause we find "This insurance * * * to cover * * * loss of or damage to * * * machinery directly caused by * * * breakage of shafts * * *". It seems clear that coverage of resultant or consequential damage only is intended. Thus a broken shaft is not a *"cause of damage" until* *it has broken and the policy covers only whatever is caused thereafter and thereby.* The phrase "excluding the cost of repairing or renewing the part containing the latent defect" is understandable because the latent defect usually causes breakage of the part itself in addition to other consequential damage. It was therefore inserted to make doubly clear the meaning of the "Inchmaree" provision where latent defects were involved.

■ We conclude therefore that the "Inchmaree" clause with the additional exclusion phrase contained within the parentheses does not change the interpretation heretofore given to the "Inchmaree" clause by courts here and in England. Broken shafts, per se, are not covered by the policy and are not covered unless the break was caused by some peril insured against in the policy. Thus, neither the cost of renewing the broken shaft or of removing it and replacing it with a new or repaired shaft are covered per se, under the "Inchmaree" clause amended by the excluding words, but only the resulting damage to "hull or machinery." [10] In this case the shaft breakage was proximately caused by negligence of the engineer, a described peril, hence the cost of the replacement shaft is recoverable and also the cost of removing the shaft and putting in the replacement shaft as well as the resulting damage caused by the break.

Insurance policies such as the one at hand, are widely purchased by owners of fishing vessels on the Pacific coast and elsewhere. The breaking of shafts is a common occurrence. Seamen are ordinarily not men of great scholastic training, and should be able to understand, in purchasing a policy, the extent of their rights.

allowed for the broken bedplate in which the latent defect existed, was the reason for the exclusion phrase added to the "Inchmaree" clause. The case has been often criticized and counsel concede it has presently little weight.

10. See the following arbitration awards involving the "Inchmaree" clause with the exclusion phrase (but not construing it), National Bulk Carriers Inc. etc. v. American Marine Hull Ins. Syndicate etc., 1949, A.M.C. 340; Thibert etc. v. Union Ins. Society etc., 1951, A.M.C. 1661.

Policies should therefore clearly inform the insured in what instance the breaking of a shaft is covered by insurance, and in what instances he must bear the loss himself. The record here shows that both the underwriters and lawyers engaged in the practice of admiralty law have vigorously disagreed as to the meaning of this policy.[11] Certainly if these men, skilled in matters of marine insurance have trouble with the policy, it follows a fortiori, that the average ship owner or master probably has more difficulty.

It would be well if the policy were rewritten so that it could be readily understood by laymen and no longer constituted in the words of Chief Justice Rugg of Massachusetts, a "snare to the insured and a barren hope to the injured."[12]

11. From the evidence it appears that certain underwriters have, as a matter of policy, paid for broken crankshafts, broken from any cause whatsoever. Others have as consistently refused to pay.

12. Lorando v. Gethro, 228 Mass. 181, 189, 117 N.E. 185, 189, 1 A.L.R. 1374.