**CONTINENTAL INS. CO. OF CITY OF NEW YORK**

v.

**PATTON–TULLY TRANSP. CO. et al.**

**PATTON–TULLY TRANSP. CO. et al.**

v.

**CONTINENTAL INS. CO. OF CITY OF NEW YORK.**

No. 14713.

United States Court of Appeals, Fifth Circuit.

April 30, 1954.

Selim B. Lemle, New Orleans, La., James D. Thames, Jr., Vicksburg, Miss. (Lemle & Kelleher, New Orleans, La., of counsel), for appellant and cross-appellees.

M. E. Ward, R. L. Dent, Frank E. Everett, Jr. (of Brunini, Everett, Grantham & Quin), Vicksburg, Miss. (Dent, Ward & Martin, Vicksburg, Miss., of counsel), for appellees and cross-appellants.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

BORAH, Circuit Judge.

This is an appeal by the Continental Insurance Company of the City of New York, the defendant in the District Court, and a cross-appeal by Patton-Tully Transportation Company and The Girod Company, plaintiffs below, in a civil action at law based on a policy of marine insurance.

Plaintiff Patton-Tully Company as owner, and Girod Company as charterer of two barges upon which the defendant had issued its River Hull policy of insurance for their account instituted this action against insurer to recover for the total loss of each barge the sum of $10,000, its agreed valuation, or an aggregate amount of $20,000. In their complaint it was alleged that one of the barges sank while being towed in the Mississippi River between Natchez, Mississippi, and Jackson Point, Mississippi, and that the other barge which was secured to the bank of the Mississippi River at Natchez broke loose from its moorings and was lost beyond recovery. In its answer, and on the trial of the cause, the insurer set up by way of defense that the barges were at all times and more specifically at the time of loss inherently unseaworthy; that neither barge was lost as a result of a peril insured against; and that as to each barge there had been a breach of the watchman's warranty. After a trial was had before the Court without a jury judgment was entered awarding plaintiffs the sum of $10,000 for the loss of the barge which sank in tow and denying them any recovery for the loss of the other barge. This appeal and cross-appeal followed.

The provisions of the policy on which defendant relies are the warranty of seaworthiness, the "perils" clause, and the watchman's warranty, which are as follows:

"Seaworthiness. Warranted by the assured that the vessel hereby insured shall be in a seaworthy condition at the time of attachment of this insurance and shall be maintained in a seaworthy condition at all times. * * *.

"Perils. It is the intent of this Company by this policy, subject to all its terms and conditions, to indemnify the assured for this company's proportion of all General Average Charges, Salvage Expenses and loss, damage or hurt to the vessel hereby insured caused by fire and the adventures and perils of the rivers and other waters that may be named herein, excepting always the following matters and things (which are excluded both as losses and causes of loss) and all claims for damage, expense or liability arising therefrom or caused thereby, viz:

\* \* \* \* \* \*

"2. Rottenness, inherent defects, and other unseaworthiness;

\* \* \* \* \* \*

"Watchmen. Warranted by the assured that the vessel hereby insured shall at all times have a competent watchman on board, except that when the vessel is laid up or moored at a regular landing she shall be in charge of a competent watchman."

The questions here, as in the District Court, are whether the evidence respect-

ing the two lost barges shows that their loss was caused by unseaworthiness rather than a peril insured against and whether there was a breach of the watchman's warranty.

There was evidence to show that the barges—155 feet long, 34 foot beam—were built in the year 1912. They were compartmented riveted steel transverse frame barges of a type not built since about 1920, and were of 180 net registered tons with a capacity of 500 short tons. These old vessels had been in charterer's possession for fifteen months and were in use as gravel barges at the time of their loss. They were not classified in the United States Army Engineers' publications as barges suitable for this work, but as barges for logging operations, and it appears that on several occasions prior to their loss a dragline bucket had knocked holes in the barges which had to be repaired to prevent the vessels from taking water. While the charterer's president, Girod, testified that such repairs were promptly made and that the barges were maintained in good condition, the witness also stated that he had never been inside the vessels; that it was customary for charterer's employees to check the barges for leaks at the unloading dock by merely observing whether or not they listed when loaded; and he conceded that it was very easy to make the barges leak. Phyfer, charterer's superintendent who was in charge of loading and unloading the barges and responsible for their mooring, testified that he had been inside the barges an unspecified number of times; had found numerous leaks where wasted rivets had pulled through the plating and from small holes that had been knocked in the barges.

There was further testimony on behalf of Phyfer that approximately three months prior to the loss of the barge which was being towed, barge No. 11, he discovered that this barge was leaking and required constant pumping. A visual inspection on his part which was restricted to one of the four main compartments revealed a hole in the bottom shell plating about the size of a quarter. It appears that an effort had been made at some prior and undetermined time to shut off this leak and the crude expedient adopted was the placement of a wooden board over the aperture which in turn was held in position by a perpendicular wooden upright which extended to the under side of the deck where it was wedged in place. When this inspection was made it was discovered that the wooden upright had completely rotted away and collapsed and as a consequence there was an influx of water equivalent to the flow from a one inch pipe. Despite the condition found charterers did not place the barge in dry dock but were content to repair the damage with a "paper patch" which consisted of tar paper, asphalt, sealing compound, over which was placed a one inch board which was secured by an upright timber which was driven in place. This second patch was in the vessel at the time of its loss.

In the condition described, barge No. 11 carrying a deck load of about 350 tons of gravel was on the morning of August 4, 1951, at 3:55 a. m. taken in tow by the towboat Betty. There was no evidence to show that the bilges were sounded or that any other inspection was made of the barge by anyone to determine its condition at and immediately prior to the time when it was taken in tow and no watchman was on board. When the tug and tow got under way barge No. 11 was lashed to the starboard side of another barge which the Betty was shoving. The crew of the tug consisted of one Captain Smoot and a deckhand. So far as the record shows neither of the crew members boarded the barge before or after getting under way. Captain Smoot of the tug Betty was the only witness to testify as to the place, time, manner, and cause of the sinking of barge No. 11. According to his story which he related at the trial the tug and tow proceeded downstream without incident up until the time that they met an ascending tug and tow in a bend in the river approximately five miles below Carthange Point. The ascending flotilla was then in the

bend favoring the right bank and the Betty and her tow were running the point and holding as close thereto as possible without encountering the sand bar which protruded therefrom. Captain Smoot stated that he made every effort to keep away from the other towboat, which was of a type similar to Federal Barge Line vessels, but because of the narrowness of the channel in this bend of the river he was obliged to pass close to her. But as to the width of the river in this bend and as to how close he was to the ascending flotilla he does not say. According to his version he encountered waves that were "big" and "rough" but we find nothing in his testimony that would indicate that the waves from the passing vessel were any different from those which were normally to be expected or foreseen. If his testimony, which we think is pure afterthought,[1] is to be believed, the wave wash caused barge No. 11 to buckle and the cargo to shift and run over the side. Whereupon the barge took on a heavy list and as this endangered the balance of the flotilla it was cut loose and beached in a sinking condition on St. Catherine bar.

Thereafter, and over a period ranging between one week and two months after the sinking, representatives of the insurer made several visits to the beached barge. The results of their inspections revealed that the barge's side plates were extensively pitted throughout with the port side plate immediately aft of No. 2, transverse bulkhead approximately ten inches above the bilge knuckle wasted through in five places; that numerous scattered rivet points were wasted away, rivets were loose in the way of side plates where visible, and scattered numerous rivets throughout the visible portion of the deck were out

and missing. There were also scattered deck plating tears, apparently dragline bucket damage, of 4 to 5 inches noted throughout. In the interior two additional temporary roofing tar paper patches with board and timber braces were discovered, one covering a hole in the port side plating approximately two feet forward of the after bulkhead in No. 1 compartment, and the other covering a hole in the starboard side plating in No. 2 compartment. In addition, the hatches were found open, with none of the hatch covers in place and dogged down with gaskets under them. Many of the hatch covers were missing although some were lying on the deck alongside the hatch openings, and no hatch had in undamaged condition all of the studs used to hold the covers in place. In no instances were cover securing nuts observed on deck and the threads of the existing studs were badly corroded with indications that no nuts had been screwed thereon for a long period of time.

The District Judge found that the barge was fit, suitable and seaworthy for the business being carried on at the time the policy was issued and took effect. But what is here important is that plaintiffs did not limit themselves to a warranty of seaworthiness at the inception of the risk, but chose to add a warranty that seaworthiness would continue as long as the policy was in force, and we must take them at their word. In this connection the Court found (1) that the barge was sufficiently strong to have made the usual and ordinary voyages under the usual and normal conditions; (2) that it was the positive testimony of Smoot that the hatch covers were on at the inception of the voyage; and (3) that the barge would have completed its voyage without incident had it

1. A statement which Smoot admitted at the trial that he signed and which defendant offered in evidence solely for the purpose of impeachment does not mention encountering any other vessel, and recites in pertinent part that Smoot felt a jar; looked up and saw barge No. 11 listing severely and beginning to turn over; and

thereupon awoke the deckhand who cut the vessel loose. Further, that "I believe that barge No. 11 must undoubtedly have sprung a severe leak while being towed and in my opinion that is what caused the barge to list while still attached to the towboat Betty."

not encountered unusual and extraordinary waves. In finding that the hatch covers were in fact properly secured the Court attributed to Smoot a statement which he did not make.[2] As to the findings that the barge was seaworthy and that the loss was attributable to unusual and extraordinary wave wash we think that the issue of seaworthiness was improperly resolved by failing to take into account the evidence which related to the physical condition of the barge and that the Court was not warranted in inferring from Smoot's testimony that waves "big" and "rough" were unusual and extraordinary. A careful review of the entire evidence has left us with the definite and firm conviction that a mistake has been committed and we hold that these fact findings may not stand. Nor may these findings be supported as a matter of law. It is a fundamental principle of marine insurance that the insured vessel is warranted to be seaworthy. This means that it should be able to withstand ordinary stress of weather, wind and wave to which it may be expected to be subjected and with which it will ordinarily be confronted. Compania de Navegacion, Interior, S. A., v. Fireman's Fund Insurance Company, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787; Arnould on Marine Insurance, Vol. II (10th English Ed.) Sec. 710. If it be assumed that the waves from a passing towboat did cause and not as we think merely accelerate the sinking, the further question arises: Was it a "peril of the river" within the meaning of the policy? Was it an extraordinary, abnormal occurrence against which the insureds could not protect themselves with ordinary precaution? Or was it a normal, customary circumstance that may occur every day? The passing of towboats along the Mississippi at the points in question is a normal occurrence that may be expected at any time. It was not extraordinary or unusual and according to Smoot he met and passed big towboats every day. It does not seem to us that displacement waves from a passing towboat are a "peril of the river" against which the barge was insured. Western Assurance Company v. Shaw, 3 Cir., 11 F.2d 495.

The trial court further found that there was a watchman on board barge No. 11. This finding was based on the theory that the barges and tug were lashed together as a unit and under the continuous observation of the master and deckhand. We need not labor the point since the warranty of seaworthiness was breached and "one breach is sufficient."[3] We deem it sufficient to say that we agree with the insurer that a warranty to have a watchman "on board" at all times while the vessel is not moored is to be strictly construed, and that the warranty has been breached where there was not a watchman actually on board, though it may appear that the master and crew were present. Home Insurance Co. v. Ciconett, 6 Cir., 179 F.2d 892; cf. Buckwalter v. Aetna Ins. Co. (The Dauntless), 143 A. 90, 6 N.J.Misc. 770, 1928 A.M.C. 1430. For all of the aforementioned reasons, we think the insurer must prevail as to barge No. 11.

We come now to consider the second[4] lost barge, which broke from its moor-

---

2. Smoot's entire testimony in respect to hatch covers is as follows:

"Q. What kind of condition was No. 23 in? A. First class condition. All of them were in good shape."

\* \* \* \* \*

"Q. What would you do to keep them in that kind of condition? A. Had to take a hatch cover off to pump them off."

\* \* \* \* \*

"Q. Did you ever check them? A. My deckhand would take the hatch off and look into it."

3. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 5 Cir., 201 F.2d 833.

4. The District Judge did not determine whether it was barge No. 22 or barge No. 23 which was lost, but treated the identity of the barge as immaterial since both barges were insured and for the same amount under the policy of insurance sued on.

ings between the hours of midnight and 2:30 a. m. on the morning of August 5, 1951. There was no eyewitness to the occurrence. What caused the breaking of the one and one-half inch mooring lines is left entirely to inference as the lines were not produced at the trial in response to the call for their production. Nor is there any clear indication as to where or under what circumstances the vessel sank, for all that appears is that its stranded hulk was found bottom up on a sand bar 48 miles below Natchez several months thereafter. The record cannot however be taken as affording no indication of the cause of sinking since the vessel was in the deteriorated and leaking condition heretofore described. Furthermore, the evidence shows that the barge was listing at the time when it was moored to the landing, at which time it had about a foot and a half freeboard and was loaded with 280 yards of gravel. This being the situation, remedial action under the inspection rules of the charterer was demanded. However, it appears that nothing was done to correct this condition although on the night in question the barge was intermittently under the observation of the charterer's mechanic, Kilgore, who made his rounds about every two and a half hours and between visits repaired motors in a shed a quarter of a mile from the water's edge. The evidence shows that Kilgore did not go on board the barge or sound its bilges and while he testified that the vessel looked all right to him when he flashed his light on it around midnight, there is no showing that he had any knowledge of barges which would render him "competent" in such matters as required by the policy. Indeed, Kilgore testified that he had been a motor mechanic and welder all his life.

On this record it is clear, and the Court so found, that the barge was not shown to be seaworthy and that the mechanic Kilgore was not a watchman within the meaning of the terms of the policy. It is also apparent that plaintiff's contention that the barge sank from a peril insured against is without support in the evidence. The burden of proof was upon plaintiffs to show that the loss occurred by perils of the river, and that they had in all respects complied with the terms and conditions of the policy. This they failed to do. Swan v. Union Insurance Co., 3 Wheat. 168, 16 U.S. 168, 4 L.Ed. 361; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398.

The judgment of the District Court that plaintiffs have and recover from defendant the sum of $10,000.00 with interest and costs for the loss of barge No. 11 is reversed. As to that portion of the judgment which holds that plaintiffs shall recover nothing for the loss of steel barge No. 22 or 23 [5] the judgment is affirmed.

Affirmed in part and reversed in part