**TROPICAL MARINE PRODUCTS, Inc.,**
Appellant,

v.

**BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA,**
Appellee.

**No. 16071.**

United States Court of Appeals
Fifth Circuit.

Aug. 13, 1957.

Rehearing Denied Sept. 11, 1957.

Wilbur E. Dow, Jr., New York City, Arthur L. Willner, Miami, Fla., for appellant.

Douglas D. Batchelor, David W. Dyer, Miami, Fla., for appellee, Smathers, Thompson & Dyer, Miami, Fla., of counsel.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by the shipowner tests the correctness of the adverse judgment of the District Court after a trial without a jury denying recovery under an American Institute Time Hull Policy for a sinking from unknown causes. So uncontradicted are the facts, as found or as controlling, that the District Judge's findings of fact were an almost verbatim adoption of those proposed by the plaintiff Shipowner, the losing party. The case turned finally in the Judge's analysis upon successive presumptions.

Except for a few editorial changes involving no matter of substance, ours is a

direct recital, with an occasional paraphrase, of the Judge's findings.

The policy was for the period August 14, 1953 to August 14, 1954. The vessel was valued at $30,000. The Sea Pak was a wooden hull vessel originally built for the United States Coast Guard. She was 71'7" long, 13'6" wide and drew 4'6" of water. In the summer of 1953, she had been overhauled [1] in Miami and in August 1953 was in good condition and seaworthy. She left Miami in August 1953 and was operated from that time until her loss in and around Caicos Islands in the Bahamas. She had not been hauled out of the water subsequent to August 1953, although she had been placed in shallow water and her bottom scrubbed on several occasions while she remained afloat.

The Sea Pak left Cockburn Harbour, South Caicos Islands, on August 9, 1954. It proceeded to a fishing anchorage in the lee of Long Key.[2] This was a distance of about eight miles. The fishing anchorage was protected from the prevailing winds and from the sea and the water, and the anchorage remained calm all the time the Sea Pak was anchored there. The vessel remained at anchor in about 15 feet of water in this protected area until approximately 5:00 a. m. on August 13. During this time the vessel was collecting conch from small skiffs that were fishing in that area.

At about noon on August 12, the Master noticed that the Sea Pak was beginning to take on an unusual amount of water and that the automatic pump was working more than normally necessary. During that afternoon and night the leaking became progressively worse. An inspection of the vessel revealed that the water was coming from underneath a refrigerated space in the forward part of the ship. Because of the construction of the interior of the vessel, the bilge underneath this area was inaccessible. Shortly before daylight on August 13, the Master felt that the leak had developed to such an extent that he should attempt to return to Cockburn Harbour.

As soon as it was daylight, or about 5:00 a. m., on Friday the 13th, the anchor was raised and the boat proceeded around the south end of Long Key into the open waters of Turks Island Passage in an effort to return to Cockburn Harbour. At this time, the sea on the wind-ward side of Long Key was choppy and there was a moderate breeze. These conditions were not unusual for that area and were not such as would ordinarily have caused the vessel any difficulty.

After the vessel got underway, the leak continued to get progressively worse and before the ship could reach Cockburn Harbour, the leak had progressed to such an extent that the vessel's engine was drowned out. The vessel then drifted back along the shoreline of Long Key until the Master ordered the crew to abandon her. The four men on board then rowed ashore in a 14' rowboat which was being towed astern of the Sea Pak and the Sea Pak eventually sank outside the 100 fathom curve. Because of

1. She was rebuilt in Miami under the immediate supervision of the underwriter's surveyor who unqualifiedly recommended her for insurance for the annual term and without any recommendations or requirements for drydocking, bottom inspection, repainting or the like. The surveyor testified:

"The hull was checked. A lot of new planks were put in the ship. The caulking was re-caulked. * * * Her stuffing boxes were checked and repacked. The vessel was completely overhauled to my satisfaction."

Her intended trade was known and the policy expressly stated:

"Navigation Limits: Warranted confined to inland and coastal waters of the Bahamas, with occasional trips to the Florida East Coast for repairs."

2. Because of intervening sand and coral shoals between the fishing ground and Cockburn Harbour, the vessel had to go outside into the Atlantic Ocean and coast well off the seaward side of Long Key, a coral key about five miles long rising precipitously from the water to a height of fifty feet or so and exposed to seas which occasionally broke over the top of these high rocky cliffs.

the depth of the water, no salvage attempt was made.

The Court concluded, as both plaintiff and defendant urged and as the physical loss which destroyed all evidence required, that "there is no explanation as to what caused the leak which resulted in the loss of the vessel."

Proceeding apparently then from an implied application which was not spelled out of a presumption[3] of unseaworthiness because the vessel developed a leak in these calm waters in the lee of Long Key, the Court held as a legal conclusion that in the face of this presumption, there was not a counter presumption[4] that the loss came within the perils covered by the policy. The Shipowner contended that even though the *sinking* of the vessel in calm protected waters might give rise to an inference of unseaworthiness, proof of seaworthiness, here admitted, as of the inception of the risk, was sufficient upon which the usual presumption[5] would operate that, in the absence of a showing that it occurred from an excepted peril, the loss was caused by a peril insured against.

The Underwriter argues that, accepting these cases urged by the Shipowner, the counter presumption that the loss was from an insured peril, does not arise unless the owner proves that immediately before the loss the vessel was in a seaworthy condition. On this it emphasizes that the Court held as a fact that the Shipowner had not shown that the vessel was seaworthy immediately prior to the developing of the leak.

But we think that the difficulty with this decision stems from the fact that,

like the underwriter, the Court assumed that the policy only insured " *   *   * the vessel against loss from extraordinary occurrences and does not insure her against those ordinary perils which vessels must encounter   *   *   *." In the quaint language which persists in this ancient policy form, the Calmar Steamship Corp. v. Scott, 345 U.S. 427, 73 S.Ct. 739, 97 L.Ed. 1125, 1953 A.M.C. 952, with its "Pirates, Rovers, Assailing Thieves   *   *   * and Detainments of *   *   * Princes   *   *   *," the Court's opinion makes it plain that all he thought involved was the initial insuring clause which he quoted:

> "Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, & c. or any part thereof."

This was to overlook a substantial insurance undertaking which, history shows, The Spot Pack, Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir., 242 F.2d 385, 1957 A.M.C. 655; Ferrante v. Detroit Fire & Marine Insurance Co., D.C.Cal., 125 F.

---

3. Paddock v. Franklin Fire Ins. Co., 11 Pick.,Mass., 227; Swift v. Union Mutual Marine Ins. Co., 122 Mass. 573; Watson v. Providence Washington Ins. Co., D.C. N.C., 106 F.Supp. 244, 1952 A.M.C. 1812, appeal dismissed, 4 Cir., 201 F.2d 736, 1953 A.M.C. 337.

4. The Court cited: Watson v. Providence Washington Ins. Co., D.C., 106 F.Supp. 244, opinion approved 4 Cir., 201 F.2d 736; Klein v. Globe & Rutgers Fire Ins. Co., 3 Cir., 2 F.2d 137; Jahn v. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53

L.Ed. 546; Long Dock Mills & Elevator Co. v. Mannheim Ins. Co., D.C., 116 F. 886; Swift v. Union Mutual Marine Insurance Co., 122 Mass. 573.

5. The Shipowner relies principally upon: Mattson v. Connecticut Fire Ins. Co. of Hartford, D.C.Minn., 80 F.Supp. 101; Boston Insurance Co. v. Dehydrating Process Co., 1 Cir., 204 F.2d 441, 1953 A.M.C. 1364; Land v. Franklin National Ins. Co., 225 S.C. 33, 80 S.E.2d 420; Glens Falls Ins. Co. v. Long, 195 Va. 117, 77 S.E.2d 457, 1953 A.M.C. 1841.

Supp. 621, 1954 A.M.C. 2026, was added voluntarily by underwriters, (with successive amendments to meet like conditions) to expand protection to shipowners and thereby overcome court decisions favorable to an underwriter but which, the underwriting fraternity thought unrealistic and a denial of coverage reasonably needed. Personified by the name of the vessel giving rise to the decision, The Inchmaree clause, with almost ritualistic uniformity provides generally, and here, specifically:

"This insurance also specially to cover &ast; &ast; &ast; loss of or damage &ast; &ast; &ast; directly caused by the following:—

&ast; &ast; &ast; &ast; &ast; &ast;

"Breakdown of motor generators or other electrical machinery and and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);

&ast; &ast; &ast; &ast; &ast; &ast;

"Negligence of Master, Charterers other than an Assured, Mariners, Engineers or Pilots;

"Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. &ast; &ast; &ast;"

This affords both an additional series of perils insured against and markedly affects the warranties of seaworthiness between Shipowner and Underwriter.

The Court here apparently labored, as did so many so long under some sort of notion that the owner owed the duty to keep and maintain the vessel in seaworthy condition and consequently, to recover, the owner must establish this as a fact. Indeed, the point of departure [6] between the plaintiff's proposed and the Court's findings adopted was over the seaworthiness [7] of the vessel immediately prior to the loss.

But as we, The Spot Pack, Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra, and the Second Circuit, New York, New Haven and Hartford R. Co. v. Gray, 2 Cir., 240 F.2d 460, 1957 A.M.C. 616, certiorari denied 77 S.Ct. 1050, 1 L.Ed.2d 915, by almost simultaneous decisions have recently pointed out, the owner's obligation under a Time Policy, as was this one, is extremely limited: the vessel is seaworthy at the attachment of the insurance, but henceforth it is a sort of negative warranty, i. e., the owner or those in privity with him will not knowingly send the vessel to sea in a deficient condition.

Here the most that was determined as to unseaworthiness of the MV Sea Pak was the Court's negative finding that the owner had not sustained its burden of proving seaworthiness. This is far from the opposite holding that the vessel was *un*seaworthy. On that, the Court did not make such a finding and perhaps for the reason that, on the record before him, it was doubtful that there was sufficient proof.[8] There was

---

**6.** On the specific issue of the *cause* of the loss, there is no real difference. The court found:
"7. There is no explanation as to what caused the leak which resulted in the loss of the vessel."
Whereas the plaintiff Shipowner proposed this finding:
"10. The precise cause and nature of the leak remained unknown."

**7.** The Court found:
"8. The Plaintiff has not shown that the vessel was seaworthy immediately prior to the developing of the leak which resulted in the loss of the vessel."

The plaintiff Shipowner proposed the exact opposite:
"11. Defendants have not shown that the vessel was unseaworthy immediately prior to her last voyage nor has there been any showing of want of due diligence on the part of the assured and owners of the Sea Pak to make her so."

**8.** To be sure the Underwriter offered as impeachment the statements of two native crewmembers, a 17-year-old Engineer and the Cook who could "write but not read" and who claimed he was intoxicated as well. These statements were given after each was escorted by a

evidence that two fishermen skindivers (not ship repairmen) made an underwater inspection a month or so before and drove in a few wooden plugs, but whether in blanked off auxiliary openings or elsewhere was extremely vague. One diver, who asserted that the bottom "was all right," also said that "there was no paint on it, no paint that you would call paint." But except for the prior inconsistent statements of the two crew members, note 8, *supra*, the evidence was uncontradicted from the current master and his immediate predecessor (who had left the vessel two weeks before her sinking for a vacation) that there were only the usual leaks one expects in a wooden hull vessel. The equivocal [9] evidence of the underwater activity of the skindivers was a circumstance which, with other evidence, could be used in drawing the competing inferences that, on the one hand, this showed careful, prudent diligence in the maintenance of the vessel or, on the other hand, the existence of an unseaworthy condition. But standing alone, it was insufficient to prove unseaworthiness and the remainder of the record would not overcome this deficiency.

The only thing of substance, pressed so hard and successfully by the Underwriter on the Court, was a presumption, note 3, *supra*, not evidence, that when a vessel *sinks* in a calm protected harbour the cause, unless otherwise satisfactorily explained, must have been unseaworthiness.

■ But even though it is assumed that this rule would apply when the leak develops while the vessel is at sea and after it has left port, the Court attributed unwarranted consequences to it. On the findings, the leak developed *after* the vessel had been out three and one-half days. If it is assumed *arguendo* that when the Sea Pak left Cockburn Harbour on August 9, she was in an unseaworthy condition, there is absolutely none that the Shipowner or anyone in privity with it knew of that. There was thus no breach of the limited warranty of seaworthiness nor of the insurance and it was effective. The Spot Pack, Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra. When, as the Court found, the unseaworthy condition (leak) developed, after the vessel was at sea and there were then no means by which to remedy it, what happens to the insurance? Does it terminate at the very moment it is needed most? Cf. Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715, 1943 A.M.C. 27, certiorari denied 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711.

Indeed, far from voiding the policy, it was as to just such unseaworthiness that the policy was meant to apply. The Inchmaree clause insures against damage or loss occasioned by latent *defects* in machinery or hull. Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of "reasonably suitable" for the purposes intended. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Compania de Navegacion, etc., v. Fireman's Fund Insurance Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787. The only limitation on

---

local policeman and taken before the British Commissioner of South Caicos as he sat on his dais flanked by the Underwriter's American lawyer and an investigator surveyor. These statements, sharply contradicting their deposition evidence that the vessel had had no appreciable leaks, stated that the Sea Pak during the six weeks prior to her sinking had leaked extensively. The Underwriter's brief asserts "the trial judge was certainly free to give the statement such weight as he saw fit." Of course, that is true as to destroying the credibility of these witnesses to prove seaworthiness. But the prior inconsistent statements were the only word testimony of unusual abnormal leaks, and they were not admissible to prove that *fact*. 58 Am.Jur., Witnesses, § 770.

9. The Underwriter's surveyor as an expert testified:
"The Court: The question is whether an adequate inspection could be made by divers while the ship is in the water?
"The Witness: In my opinion, no, sir."

this is that the defect be latent and one not known or discoverable by the owner or one in privy with him. This is so because, as we held in Spot Pack Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra, the phrase "Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners, or Managers of the Vessel" does not include acts of the master or crew members merely imputed on notions of *respondeat superior*.

Here, of course, the owner was in the United States and on this record all was left to the master. There is no evidence that the nonresident owner had personal knowledge of this condition, whatever existed, or the necessity for any detailed drydocking, bottom inspection, scraping or repainting. The policy, as is so often the case, did not prescribe any requirement for drydocking or a routine period for drydocking. That there might have been testimony that the bottom paint was gone, and one surveyor faintly suggested that he thought the vessel should have been hauled out every six months or so to avoid action by wood-destroying worms (an opinion expressed without knowledge of the practice following in the Caicos Islands where the evidence indicated an absence of such wood borers) was not of that caliber essential to a holding that the Shipowner personally failed to take prudent steps.

The defect was certainly latent in a practical sense. The Court found that there is "no explanation as to what caused the leak." And all are unanimous that it was and could not be determined. As the leak was increasing, the master and engineer determined that it had to be coming from that part of the hull in way of the freezer compartment. There was positively no means of checking the inside of the hull in this space and, of course, lying at anchor eight miles from port, there were no facilities established for a worthwhile inspection or repair over the side.

Since cases should be decided on practicalities and not theoreticals, the fact that this record stands uncontradicted that the hull did not leak in this way, at this place, or in this quantity prior to departure from port August 9, or on any one of the intervening days up to the afternoon of August 12, demonstrates also that if, as some theorize, a butt (the joinder of the ends of two of the hull planks) sprung to permit the leak, there is no [10] basis for concluding that the defect could then have been discovered.

And if the matter is approached from the viewpoint that the Shipowner, without the benefit of any presumptions, must affirmatively establish that the particular defect was latent within the classic [11] meaning of the term, the result is the same. Since the Underwriter's as-

---

10. The Underwriter's expert testified:
    "Q. What would cause a butt **to** spring?
    "A. A poor fastening.
    "Q. What?
    "A. A poor fastening, or the wood is soft around the fastening."
    He did not, of course, undertake to say that such poor fastening would have been discoverable. In any event, his testimony was uncontradicted that at least one plausible cause might not show up (be discoverable) for some time:
    "Q. She might have strained a butt in the seaway at some previous date, which showed up later?
    "A. That could happen."

11. "A latent defect is one that could not be discovered by any known and customary test." The West Kyska, Water-

man S.S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687, at page 694, 1946 A.M.C. 997, at page 1003, certiorari denied 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656, and "* * * is a hidden defect and generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear." Ferrante v. Detroit Fire & Marine Insurance Co., D.C.Cal., 125 F.Supp. 621, at page 624, 1954 A.M.C. 2026, at page 2030. It is "A hidden defect * * * not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; * * * a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection * * by any known and customary test." 26A

sertion of unseaworthiness is a claim that the hull was defective, it was either latent or not latent. If it was not discoverable prior to departure for sea by all known and customary tests, it was latent and covered under the policy. If, on the other hand, it is claimed that the proof showed that it was discoverable by prudent inspections, or that the proof failed to show that prudent inspection could not have revealed it, the result is that the defect was one which in prudence ought to have been discovered. On this hypothesis, it was the Master who should have discovered it. If the Master knew of the leak or the conditions likely to give rise to leaks, or if the Master, not knowing that, knew enough that he ought to have discovered this condition, it was his clear duty to his Shipowner to do all that prudence required to ascertain and correct such conditions. The record is uncontradicted that the Master was responsible for the current upkeep, maintenance and repair of the vessel while she was in the Islands, and that the Shipowner had approved all of his maintenance requirements. The Master's failure in carrying out this duty to his Shipowner was negligence and, under the Inchmaree clause, this too was specifically covered.

■ If the defect could have been discovered the resulting unseaworthiness was due to the Master's negligence; if it was not discoverable by him or Shipowner, it was latent. Either way the Underwriter turns, the loss is within his expanded coverage.

To be remembered also is the fact that this vessel did not sink in a calm sea or in the harbour-like protection of the lee of Long Key. A leak developed there, and the leak became increasingly worse. But the sinking of the ship was the direct action of substantial seas with wind abeam, while running off the exposed precipitous coast of Long Key in the effort to make the port of haven. It was undisputed that with the butt sprung,

the action of the vessel being pushed ahead by her own power, working against the seas, would open up the planks even further. While it is true that these seas were not tempestuous, it is just as true that it was the cruel sea working on a troubled hull which changed a possible sinking in fifteen feet of water at the fishing anchorage into an inevitable total loss as she sunk to the watery grave outside the 100 fathom curve.

■ When the leak was discovered the vessel, as we said above, still had insurance. Likewise, there was no duty owed the Underwriter not to attempt to make a port of haven. Negligence of the assured or his agent is no defense to a marine policy, New York, New Haven and Hartford R. Co. v. Gray, supra, 240 F.2d at page 464; Orient Mutual Insurance Co. v. Adams, 123 U.S. 67, 8 S. Ct. 68, 31 L.Ed. 63; Columbia Insurance Co. of Alexandria v. Lawrence, 10 Pet. 507, 35 U.S. 507, 9 L.Ed. 512; Waters v. Merchants' Louisville Insurance Co., 11 Pet. 213, 36 U.S. 213, 9 L.Ed. 691; Patapsco Insurance Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659. And if it is assumed that to attempt the voyage in the exposed sea with the vessel in this weakened condition was a negligent act, it inevitably was negligence of the master then in sole command who alone determined whether to attempt the perilous run for sanctuary rather than risk sinking in fifteen feet of water, or pressing her bow onto the sand shoals. But there again, the more palpable was the master's negligent choice of these alternatives, the more categorical it makes the Inchmaree liability for "negligence of master."

We cannot emphasize too strongly that, as was the purpose of the underwriters in making the change, the Inchmaree clause is an expansion of coverage of considerable magnitude. Unlike so many cases, Union Insurance Co. of Philadel-

C.J.S. Defect. p. 133. Mellon v. Federal Ins. Co., D.C.N.Y., 14 F.2d 997; The Bill, D.C.Md., 47 F.Supp. 969, 1942

A.M.C. 1607, affirmed Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 145 F.2d 470, 1945 A.M.C. 108.

phia v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; Continental Insurance Co. of City of New York v. Patton-Tully Transportation Co., 5 Cir., 212 F.2d 543, 1954 A.M.C. 889; Ideal Cement Co. v. Home Insurance Co., 5 Cir., 210 F.2d 937, 1954 A.M.C. 663; Hanover Fire Insurance Co. v. Holcombe, 5 Cir., 223 F.2d 844, 1955 A.M.C. 1531, certiorari denied 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787, where each policy contained an express warranty of continuing seaworthiness and an exclusion of losses caused by unseaworthiness, a Time Hull Policy with no warranty of continuing seaworthiness but with an Inchmaree clause does in fact underwrite unseaworthiness of many types.

If a vessel has become unseaworthy due to the negligence of master or engineer in the maintenance of the vessel, in putting to sea without adequate equipment, fuel or stores, or without making required repairs at outports where the master is the sole principal representative of the owners, the "cause" is negligence and this is expressly underwritten. If there is an undiscoverable defect in hull or machinery, the resulting unseaworthiness or the damage caused by it [12] is nonetheless covered.

Consequently, this is not the simple case in which a loss due to unseaworthiness affords a double-barreled reason for nonpayment—a defense based upon the breach of the warranty, express or implied, or as automatic proof that the loss arose from this rather than a specified peril (perils of the sea) insured against. For if the vessel really sank because the hull was unseaworthy, or by reason of the action of the sea on that unseaworthy hull, as distinguished from the action of the sea alone, this no longer

automatically denies recovery. Recovery is denied now only if that unseaworthiness is one not caused or brought about by the various elements of the Inchmaree clause.

The judgment denying recovery is therefore reversed and here rendered for the plaintiff Shipowner.

Reversed and rendered.

---

12. Add to this the endless possibilities for other specific Inchmaree coverages not quoted in the excerpt above: "Accidents in loading, discharging or handling cargo, or inbunkering," e. g., damage to hull from use of unseaworthy winch, booms or cargo gear; damage to vessel during loading or discharging operations resulting from the unseaworthiness brought about by such operations, e. g., listing, faulty trim, overloading. "Explosions on shipboard or elsewhere," e. g., from accumulations of gases from unseaworthy valves or tanks, malfunctioning of pressure relief valves on air tanks, manifold headers, etc. "Breakdown of motor generators or other electrical machinery and electrical connections thereto," e. g., collision damage from failure of unseaworthy electrical steering engine.