**Paul Garry GIBBAR and Kenneth Lee Gibbar, Trustees of Paul-Viola Gibbar Trust, Appellees,**

v.

**CALVERT FIRE INSURANCE COMPANY, Appellant.**

**No. 79–1571.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1980.

Decided April 30, 1980.

Amended Order May 21, 1980.

Michael O'Keefe, Thompson & Mitchell, St. Louis, Mo., argued and Thomas R. Jayne, St. Louis, Mo., on brief, for appellant.

Milton I. Goldstein, Goldstein & Price, St. Louis, Mo., argued and Gary T. Sacks, St. Louis, Mo., on brief, for appellees.

Before LAY, Chief Judge, BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Calvert Fire Insurance Company (the insurer) appeals from a judgment[1] awarding the Gibbars (the insureds) the sum of $41,722.70, plus interest, for accidental damage to the seagoing vessel M/V Linda under a "Hull and Machinery" marine insurance policy. For reasons set forth below, we affirm the judgment.

I. *Factual Background.*

The insureds purchased the M/V Linda after the vessel had sustained extensive

---

1. The opinion of the district court is reported at 471 F.Supp. 323 (E.D.Mo.1979) (Regan, J.).

damage in a fire. By the end of August 1976, the vessel had been refitted; repairs included rebuilding of the hull and an overhaul and replacement of engine components. The engines were checked, tuned, and tested late in August. On September 1, 1976, the insureds river-tested the vessel and the engine seemed to perform well. On the day of the accident, September 6, 1976, the insureds intended to test the operation of the vessel on the Mississippi River. During the first hour, everything went well. Thereafter, an oil leak developed in the port engine and the engineer shut it down in order to repair the oil leak. At this time the starboard engine remained running. The engineer heard the starboard engine slow down and then speed up going faster and faster at a runaway speed, until the engine wrecked itself, throwing counterweight, rods, and crankshaft outside of the engine unit.

Following this incident, inspection of the engine revealed that two fuel injectors, No. 7 and No. 15, had stuck, causing the damage. None of the witnesses was able to state precisely why these fuel injectors failed.

One of plaintiffs' witnesses, Patrick Brandell, a chief engineer on a tugboat, had spent nearly three days checking the engines of the M/V Linda after they had been rebuilt. Although he did not know why the injectors stuck, he did list four possible causes:

1) varnish buildup;
2) foreign objects in the fuel (sludge, carbon, metal particles, or dirt);

3) an injector's plunger barrel sticking (because of a foreign object); or
4) a burr on the gears or "mic rods" of the injector.

The insurer's appeal focuses on the absence of evidence to demonstrate the specific cause of the sticking of the fuel injectors which caused the loss. The insurer contends that under such circumstances the insureds did not establish that the damage to the vessel was due to a peril within the policy.

## II. *The Additional Perils Clause.*

The peril at issue here, "loss of or damage to the vessel * * * directly caused by * * * any latent defect in the machinery * * *," lies within an additional perils or "Inchmaree" clause.[2] Judge John R. Brown, in *Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania*, 247 F.2d 116, 119 (5th Cir.), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957), has commented on the historical background of this clause:

[The clause] was added voluntarily by underwriters, (with successive amendments to meet like conditions) to expand protection to shipowners and thereby overcome court decisions favorable to an underwriter but which, the underwriting fraternity thought unrealistic and a denial of coverage reasonably needed.

Quoting language very similar to that employed in the present policy (*see* note 2 *supra*), the court noted the "almost ritualistic uniformity" of these clauses. *Tropical*

2. That clause, in full, reads:
This insurance also covers loss of or damage to the vessel named herein directly caused by:
Accidents in loading, discharging or handling cargo, or in bunkering;
Accidents in going on or off, or while on drydocks, graving docks, ways, marine railways, gridirons or pontoons;
Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or *any latent defect in the machinery* or hull, (excluding the cost and expense of replacing or repairing the defective part);
Breakdown of or accidents to nuclear installations or reactors not on board the vessel named herein;
Contact with aircraft, rockets or similar missiles, or with any land conveyance;
Negligence of charterers and/or repairers, provided such charterers and/or repairers are not assured(s) hereunder;
Negligence of master, mariners, engineers or pilots;
provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them. [Emphasis added.]
*See generally* Tetreault, *The Hull Policy: The "Inchmaree" Clause*, 41 Tul.L.Rev. 325 (1967).

*Marine, supra,* 247 F.2d at 119. Judge Brown also noted "endless possibilities" under the Inchmaree clause for insurance coverage of various types of specific incidents, including:

> "[a]ccidents in loading, discharging or handling cargo, or inbunkering," e.g., damage to hull from use of unseaworthy winch, booms or cargo gear; damage to vessel during loading or discharging operations resulting from the unseaworthiness brought about by such operations, e.g., listing, faulty trim, overloading. "Explosions on shipboard or elsewhere," e.g., from accumulations of gases from unseaworthy valves or tanks, malfunctioning of pressure relief valves on air tanks, manifold headers, etc. "Breakdown of motor generators or other electrical machinery and electrical connections thereto," e.g., collision damage from failure of unseaworthy electrical steering engine. [*Id.* at 123 n.12.]

### III. *The Latent Defect Provision*

The particular additional perils clause phrase at issue here is the coverage for "any latent defect within the machinery * * *." *See* note 2 *supra.* Over the years, courts have variously defined the phrase "latent defect." We focus on the definition of "latent defect" employed for Inchmaree clause purposes. *See* Tetreault, *The Hull Policy: The "Inchmaree" Clause,* 41 Tul.L.Rev. 325, 336–38 (1967). In contrast to cargo cases, which construe a true "latent defect" to mean a flaw in the metal, insurance cases define the phrase in terms of the skill required to uncover the defect. *Id.* The court in *Tropical Marine, supra,* 247 F.2d at 122, stated the following definition of "latent defect" as used in an Inchmaree clause:

> If it was not discoverable prior to departure for sea by all known and customary tests, it was latent and covered under the policy.[3]

The insurer introduced testimony of Leslie Buglass, a recognized writer and expert on marine insurance policies. That witness acknowledged that a latent defect is not limited solely to defects in metal. The insureds cite the following definition of latent defect from a publication authored by Mr. Buglass:

> What constitutes a latent defect has always presented some difficulty. Perhaps this is the best definition of a latent defect: "A defect is said to be latent when it cannot be discovered by a person of competent skill using ordinary care". [Buglass, *Marine Insurance Claims; American Law and Practice* 31 (2d ed. 1972).]

For purposes of this litigation, we adopt this definition of latent defect.

At trial, the insureds introduced evidence bearing upon whether a latent defect existed when the vessel left port. Paul House, the insureds' maintenance engineer, testified to performing a substantial overhaul of the diesel engines on the vessel prior to the accident. New valve covers, gaskets, fuel lines and filters were installed, the lines flushed, the injectors checked by rack, rod, and gauge, and then bled. In the overhaul, two fuel injectors on the port engine and four on the starboard engine were replaced. The engines were tested with and without weights and performed well. The engines had experienced about 8,000 hours of wear, less than one-half the usual hours before overhaul.

Noting that the insureds bore the burden of proving that the loss came within the policy coverage, the insurer claims that the insureds' evidence failed to establish that a latent defect caused the loss. We agree with the insurer's contention that in a case of this kind the insured bears the burden of proving that the loss resulted from a covered peril. *See Northwestern Mutual Life Insurance Co. v. Linard,* 498 F.2d 556, 561 (2d Cir. 1974); *S. Felicione & Sons Fish Co. v. Citizens Casualty Co. of N.Y.,* 430 F.2d 136, 138 (5th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *Continental Insurance Co. v. Patton-Tully Transportation Co.,* 212 F.2d 543,

---

**3.** *Quoted in* Tetreault, *The Hull Policy, supra,* 41 Tul.L.Rev. at 336.

548 (5th Cir. 1954); *Boston Insurance Co. v. Dehydrating Process Co.*, 204 F.2d 441, 443 (1st Cir. 1953); *Southport Fisheries, Inc. v. The Saskatchewan Government Insurance Office*, 161 F.Supp. 81, 85 (E.D.N.C.1958).

Accordingly, the plaintiff in this case was required to prove that the destruction of the starboard engine of the vessel was due to a "latent defect."[4] That does not mean, however, that the insured was required to prove the exact nature of the accident or casualty which in fact caused the loss.

Although the burden of persuasion on the issue of latent defect vel non is upon the insured, he can, by making a prima facie case, shift the burden of going forward with the evidence to the insurance company. If the insurer does not meet the burden of going forward, it runs the risk of an adverse holding.

Here, the insureds established the following:

1) That the machinery operated properly prior to the mishap;

2) That the usage of the machine had not exhausted its useful life under ordinary expectations;

3) That mechanical damage from outside elements such as foreign particles was unlikely to occur because of cleanout of fuel lines; and

4) That metal breakage, among other causes, may have caused the malfunction of the starboard engine.

Under these circumstances, the insureds made out a prima facie case of coverage, for a factfinder might reasonably infer that an undiscoverable defect related to the operation of the fuel injectors of the starboard engine. The appellees were not bound to go further and prove the exact nature of the accident or casualty which in

fact occasioned this loss. *See Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania, supra; Mellon v. Federal Insurance Co.*, 14 F.2d 997, 1002 (S.D.N.Y.1926).

The analysis in *Tropical Marine* supports our approach here. In that case the wooden hull vessel, Sea Pak, after overhaul in 1953, operated in the Bahamas. While lying in protected anchorage, the vessel began leaking in the forward part of the ship in an area inaccessible for repairs. The ship's captain attempted to return the ship to harbor. Enroute, the leak became progressively worse and the vessel sank. Because of the sinking, there was " 'no explanation as to what caused the leak.' " *Tropical Marine, supra*, 247 F.2d at 118, *quoting* from the trial court's conclusion. The trial court in *Tropical Marine* denied recovery under the hull policy by relying on a presumption that a ship which develops a leak in calm waters is unseaworthy. In reversing, the Court of Appeals observed that the presumption did not resolve the issues of when the ship became unseaworthy and whether the insured knowingly put an unseaworthy vessel to sea. *Tropical Marine, supra*, 247 F.2d at 120. Upon review of the record, the court found no evidence that the insured knew or should have known of the defect or that the leak existed prior to the departure for sea. *Id.* at 121. The court viewed the accident in a practical sense and deemed the defect latent although there was "no explanation as to what caused the leak." *Id.* at 121.[5]

We similarly adopt a pragmatic view of the evidence in this case. Here the starboard engine performed well at the start of the voyage. The engine thereafter "blew up" as the result of a mechanical failure. The shipowner established a likelihood that the cause of the engine failure originated

---

4. The insured focused on a latent defect relating to the fuel injectors specifically because if the defect had been in the starboard engine generally, the repair and replacement costs of the entire engine would be excluded under the policy. *See* note 2 *supra* (parenthetical provision in the policy excludes repair or replacement costs of the defective part).

5. The court went on to offer an alternative rationale: if the defect was discoverable, then the loss resulted from the Master's negligence, also a risk covered in the Inchmaree clause. *Id.* at 122.

with a defect within the fuel injectors. That proof makes out a prima facie case of coverage under the policy. The burden of going forward with rebuttal evidence rested upon the insurer.

The insurer through cross-examination of insureds' witness sought to establish that external factors, such as dirt from the fuel lines, could cause the malfunction. We assume, arguendo, that such cause, if established, falls outside of the policy coverage.

The trial court was obligated to examine all of the evidence to determine whether it was more consistent with a latent defect or some other cause of the casualty. The district court specifically found that the failure of the fuel injectors constituted "a latent defect in the machinery or hull." 471 F.Supp. at 325. In our judgment this determination amounts to a factual finding that an undiscoverable defect caused the loss. Although the trial court erred in stating that the insurer bore the burden of proving that the failure of the fuel injectors "was not due to a latent defect," that ruling must be construed as a determination by the court that the insurer's proof did not overcome the insureds' prima facie case of coverage under the policy.

The trial court's determination that failure of the fuel injectors constituted "a latent defect in the machinery" within the Inchmaree clause is supported by the evidence and, in light of the whole record, justifies an affirmance. *See Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania, supra.*

Accordingly, we affirm.

### AMENDED ORDER

The court having considered appellees' bill of costs, appellant's objection to appellees' bill of costs and appellees' response thereto, it is now here ordered by the court that appellees should be allowed Two Hundred Dollars ($200.00) for printing costs.

Under this court's rules, it is not necessary to print the briefs. *See* 8th Cir. R.11 B. The court is reluctant to tax a losing party for the luxury of unnecessary printing of briefs. Thus, the appellees' claim of $453.81 for the full expense of the printing of briefs is disallowed in substantial part.