MELLON, Director General of Railroads, v. FEDERAL INS. CO.

(District Court, S. D. New York. September 14, 1926.)

1. Insurance ⊝⇒665(4)—Evidence held not to show injury to steamship boiler was caused by bursting of another boiler within terms of policy.

Evidence held insufficient to establish that cracks and fractures found in the starboard one of three boilers originally in a steamship were caused by the bursting of the port boiler under test, which occurred eight months before such injury was discovered, so as to come within the terms of a policy insuring against damage to hull or machinery through "bursting of boilers."

2. Insurance ⊝⇒402—"Latent defect," within terms of marine policy, does not cover lack of complete homogeneity in tensile strength.

Within marine policy insuring against damage from latent defects, lack of complete homogeneity in tensile strength is not the equivalent of a latent defect in metal at the point of a fracture, occurring after several years of service; but a comparative local weakness must be based on some visible defect, or should be shown under a test to be fairly pronounced, to indicate that bursting was not due to wear and tear or inevitable depreciation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Latent Defect.]

**3. Insurance ⊜⇒402—Bursting of steamship boiler during test required by law held covered by terms of marine policy.**

Where a steamship boiler burst while being subjected to hydrostatic test required by law, the bursting cannot be considered as caused by a deliberate act but was fortuitous, and is within the perils and "Inchmaree" clauses of a marine policy insuring against risk from "causes of whatsoever nature arising on shore or otherwise," and expressly covering "bursting of boilers."

**4. Insurance ⊜⇒402—Fractures developed in steamship boiler held not covered by the terms of a marine policy.**

Fractures developed in a steamship boiler, it not being shown when they originated, whether they arose from latent defects, wear and tear, or inevitable depreciation, *held* not within the terms of a marine policy insuring against damage through "bursting of boilers" or "other causes of whatsoever nature."

**5. Insurance ⊜⇒402—General provision of perils clause of marine policy covers all "risks," but not certainties, as wear and tear or depreciation; "other causes."**

The perils clause of a marine policy insuring generally against damage from "other causes of whatsoever nature" covers all "risks," but does not cover certainties, as wear and tear or depreciation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Other.]

**6. Insurance ⊜⇒402—Clause of marine policy insuring against damage through latent defects in machinery does not cover the defects themselves, but only damage caused by them.**

The "Inchmaree" clause of a marine policy insuring against damage, inter alia, "through any latent defect in machinery or hull," does not cover the defect itself, which would not be a contract of insurance, but of warranty, and the fact that a latent defect in machinery was discovered during the currency of the policy does not establish liability of insurer, where no damage was caused by it.

**7. Courts ⊜⇒98.**

It is particularly desirable in cases of marine insurance that the American and English courts should be in harmony.

**8. Insurance ⊜⇒402.**

Even under an "all risk" marine policy there must be a fortuitous event to give rise to any liability.

In Admiralty. Suit by Andrew W. Mellon, Director General of Railroads, against the Federal Insurance Company. Decree for libelant on one of the two causes of action pleaded, and for respondent on the other.

Burlingham, Veeder, Masten & Fearey, of New York City (Van Vechten Veeder and A. H. Neely, both of New York City, of counsel), for libelant.

Bigham, Englar & Jones, of New York City (D. Roger Englar, of New York City, of counsel), for respondent.

AUGUSTUS N. HAND, District Judge. This suit is to recover upon two insurance policies (one covering from January 1, 1918, to December 31, 1918, and the other from January 1, 1919, to December 31, 1919) for injuries to two boilers on the steamship El Mundo The port boiler burst when subjected to the annual hydrostatic test required by law. Shortly thereafter the starboard boiler, though it passed the test satisfactorily, developed leaks, and, upon further examination, was found to have cracks in the shell and to be in a serious condition. The cost of repairing the port boiler was $69,305.38, and the starboard boiler $72,210.37

[1] The insurance policies contained the following provisions:

"Touching the adventures and perils which we, the said assurers, are contented to bear and take upon us, they are of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition or quality soever, barratry of the master and mariners, explosions, riots, or other causes of whatsoever nature arising, either on shore or otherwise, causing loss of or injury to the property hereby insured, and of all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said ship, etc., or any part thereof. * * *

"This insurance also specially to cover (subject to the $2,500 D/A warranty) loss of or damage to hull or machinery, through the negligence of master, charterers, mariners, engineers, or pilots, or through explosions, bursting of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship, or any of them, or by the manager, masters, mates, engineers, pilots, or crew not to be considered as part owners within the meaning of this clause should they hold shares in the steamer."

The three boilers of the El Mundo were subjected to a hydrostatic test on August 1, 1918, which was conducted by government inspectors in accordance with the rules and regulations. The boilers were allowed a pressure when in service of 200 pounds, the hydrostatic pressure sought to be applied

in making the test was 300 pounds, and their theoretical strength was sufficient to resist a pressure of 1,000 pounds. During the test, and after the pressure had gradually been brought up to 275 pounds, the port boiler burst with a loud noise. No injury was done to the center boiler, which was next to it. On August 3, 1918, the starboard boiler was given the usual interior examination by the inspectors, and was also successfully subjected to a hydrostatic test of 300 pounds, and was apparently uninjured. All three boilers were connected, so that the pressure of the test was applied to each. While the examination and test of the starboard boiler disclosed no defects, it was impossible to discern small cracks, had such existed, by an inspection of the interior, for some parts of the inner surface of the boiler were hidden by tubes, and fine hair cracks might not be discovered by such an examination, because they would be too small. It remains a significant fact, however, that no defects were discovered after the usual careful test made at this time.

The El Mundo received a permit to operate with two boilers after the port boiler burst, and she proceeded on her regular trips from New York to Galveston and return, and continued them for about eight months. During that period some small leaks developed in the starboard boiler, which were from time to time repaired. But in March, 1919, a leak appeared in one of the circumferential butt straps, and water was seen coming from the outside of this butt strap. (Minutes, pp. 38, 39.) Hebble testified (at page 90 of the Minutes):

"We had to lay the ship up to repair the port boiler; and if my memory serves me right, when she came in, that trip, when we discovered the leak in the butt strap, we concluded to lay her up immediately."

It is interesting to note that no record proof is available showing in detail the pressure to which the boilers were subjected while the vessel was making her trips during the eight months when only two boilers were in use, nor were any data furnished to show the length of time taken in firing. Such information might throw important light on the cause of the leaks in the starboard boiler, and the origin of her fractures. It is a notorious fact that there was a shortage of vessels during the great war. In such circumstances there was a great temptation to relax prudence in aid of expedition, and to overcome the loss of one boiler by working the remaining two harder than usual. This could only be done by increasing the steam pressure on the long trips from New York to Galveston. The boilers were regularly inspected by an internal examination every three weeks after August 1, 1918, as they were before; but nothing is shown to have developed during the eight months of her subsequent operation, except small leaks and cracks about rivet holes, until the leak appeared around the outside of the butt strap in March, 1919, just before the vessel ceased her trips and was laid up for boiler repairs. When she was taken to dry dock, the lagging and sheet iron covering which enveloped the starboard boiler were removed. It was then that the following condition was described:

"The inboard sheet of the forward course of shell through the rivet holes where it joins the heads was fractured. The after head through the rivet holes had one diagonal fracture extending from the edge of the plate for a distance of 33 inches. Four shell butt straps were cracked. The lower course of the forward head was cracked practically all around through the rivet holes. The forward tube sheet was cracked through the rivet holes where it joined the lower course. Both plates in the center course of the shell plate cracked through the rivet holes. Four butt straps for the center course of shell plate cracked. Two of the shell plates were cracked through the rivet holes at the forward end where they joined the center course of plating." (Minutes, pp. 39, 40.)

The cracks in both the port and starboard boilers had straight even edges, without reduction of area or elongation in the metal. Libelant's chief witness, Hebble, said that this showed that there must have been defects or flaws in the metal of both boilers. Both Hebble, the superintending engineer of the libelant, and Gray, the chief engineer of the El Mundo, as well as libelant's witness, Frank S. Martin, expressed the belief that the test on August 1, 1918, resulting in the bursting of the port boiler, caused the cracks in the starboard boiler, which were further opened by the subsequent pressure on the boiler when in operation. Their theory was that the sudden release of the pressure, due to the bursting of the port boiler, strained the starboard boiler in the weak places where the flaws existed, and opened fissures.

Three witnesses were called for the respondent in answer to this contention. They said that the bursting of the port boiler could have had no connection, or, at least, no substantial connection, with the damaged condition of the starboard boiler. Mr. Jor-

dan said: "I cannot conceive that it would have anything to do with it." (Minutes, p. 95.) Mr. MacNaught said: "I can see no connection between the damage caused to the starboard boiler by the fracturing of the port boiler." (Minutes, p. 98.) Mr. Haight testified that it was "not a material factor in my opinion," though he added: "If the starboard boiler were bad for some cause, nearly at the breaking point, when the port boiler failed, I would say that the failure of the port boiler might have some effect on the starboard boiler." (Minutes, p. 100.)

Now it seems strange, if the bursting of the port boiler was the cause of all the trouble, that the vessel should have been able to run for eight months with only some trivial repairs to leaks in the starboard boiler. One would suppose that, if the bursting of the port boiler had fractured the starboard boiler, a large leak would have started immediately, sufficient to make its way through the lagging. Certainly prior to March, 1919, no such leak developed, and no interior cracks were discovered in spite of an immediate examination. Moreover, a strain sufficient to crack the starboard boiler ought to have affected the center boiler more readily than the starboard boiler, for the center boiler was 8 or 10 feet nearer to the port boiler than the starboard boiler was. But the center boiler remained intact, and the men in the engine room of the starboard boiler were uninjured by any concussion which occurred. Moreover, the unanimous testimony that none of the fractured edges in either boiler showed any pitting or corrosion makes it difficult to believe that cracks, if caused in the starboard boiler by the bursting of the port boiler on August 1, 1918, would have had an uncorroded appearance nine months afterwards, when the starboard boiler was stripped and the cracks were first seen.

[2] I think the evidence insufficient to show that the damage to the starboard boiler was "through * * * bursting" of the port boiler, so as to come within the terms of the policy, if that instrument be taken to impose liability only for damage to *other* machinery "through bursting of boilers." The testimony of Hebble was to the effect that both boilers gave way because of latent defects, but I am not convinced of the correctness of this theory. Here we have boilers that have operated successfully for eight years. No defect in the metal has actually been found. The only testimony in any way suggesting a visible defect is the uncorroborated statement of Hebble

that "the fiber of the fracture * * * seemed short." (Minutes pp. 29, 30.) The examination, so far as it disclosed anything, showed that the metal of the boiler was of the right composition and homogeneity. There may have been some portions slightly less able to withstand strain than others, but to regard a lack of complete homogeneity in tensile strength as the equivalent of a latent defect in metal at the point of fracture is, I think, too theoretical a view. A comparative local weakness must be based upon some *visible* defect in the material, or should be shown under a test to be fairly pronounced, in order to indicate that bursting was not due to wear and tear or inevitable depreciation, rather than to what can be termed a latent defect in any workable sense.

The whole argument supporting the theory of a latent defect is really based upon lack of elongation or reduction of area in the metal at the points of cleavage. Mr. Jordan testified that a fracture of this description might occur without a defect in the composition of the metal. He said: "You may have a fracture between two rivet holes, that weakened that particular place. Your strain then goes on and tears it asunder, just the same as you tear a piece of paper. You do not get in a fracture of that description there, an elongation of area or an elongation the same as you do when you actually put a steady test on a new piece of plate." (Minutes, p. 97.)

It seems highly speculative, without more definite tangible evidence, to say that the fractures in either boiler were due to latent defects, when both had worked perfectly for 8 years, and Gray, the chief engineer of the vessel, characterized them as "better boilers than ever I had charge of." (Deposition of Gray, p. 5.) This is especially so when no flaw in the composition of the metal was ever visible, and one knows so little about the strains to which they might have been subjected by too rapid firing or too high pressure during this long period. The life of boilers, as of all other things, is bound to be affected vitally by the character of their use.

Mr. John L. Crane, the government local inspector, who was present at the test when the port boiler burst, testified that he and his office were unable to determine the cause, and I have the same difficulty. (Minutes, pp. 52, 53.) Moreover, libelant's surveyor, Frank S. Martin, in discussing the cause of the injuries to the starboard boiler, said nothing about a latent defect,

but said: "Damage was due to some cause extraneous to the boilers themselves. The exact cause is impossible to determine." (Exhibit 7.)

It is plain that on August 1, 1918, the port boiler burst under a hydrostatic pressure of only 275 pounds, and that in May, 1919, the starboard boiler was found to have serious fractures. Why the port boiler should have burst under a hydrostatic pressure of only 275 pounds I have been unable, after most careful thought, to determine. I am equally at a loss to say why the starboard boiler was apparently sound in August, 1918, and displayed serious fractures in May of the following year. It might have been due to latent defects, or it might have been due to wear and tear because of severe use, or to inevitable depreciation. One can only speculate about the real cause. I will add that, if there were latent defects in the composition of the metal of either boiler, there is insufficient proof that they originated during the term of either policy of insurance.

[3] It remains to apply the principles of law to the facts as I view them. The first cause of action in the libel is based upon a policy of insurance covering the period from January 1, 1918, to December 31, 1918. After reciting the causes I have quoted, it is alleged in the libel that:

"On or about August 1, 1918, the port boiler of said steamship burst, and the starboard boiler became cracked or fractured, from one or more of the causes covered by the aforesaid policy of insurance. In consequence of the bursting of the port boiler and the cracking of the starboard boiler, said vessel was damaged to the extent of $141,515.75, and the libelant sustained loss and damage in said sum."

Now the traditional form of perils clause in marine insurance policies reads as follows:

"Touching the adventures and perils which we, the said assurers, are contented to bear and take upon ourselves, they are of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition and quality soever, barratry of the master and mariners, and of all other perils, losses and misfortunes that have or shall come to the hurt, damage or detriment of the said ship, etc., or any part thereof. * * * "

The words "and of all other perils, losses and misfortunes" were held to cover the bursting of a boiler, which damaged the ship, in the case of West India Telegraph Co. v. Home & Colonial Insurance Co., 6 Q. B. D. 51, though the bursting of a boiler was not strictly a "peril of the seas." In the case of Thames & Mersey Marine Ins. Co. v. Hamilton Fraser & Co., 12 App. Cas. 484, the earlier case was distinctly overruled, and the general words in the perils clause were limited "to the same genus as the specific words that precede them." That case related to an accident on the steamship Inchmaree:

"There was a donkey engine with a donkey pump on board, and the donkey engine was set to pump up water from the sea into the boilers. Those in charge of the operation did not take the precaution of making sure that the valve of the aperture leading into one of the boilers was open. This valve happened to be closed. The result was that the water, being unable to make its way into the boiler, was forced back and split the air chamber, and so disabled the pump. That was the beginning and end of the misfortune." Opinion of Lord Macnaghten.

The House of Lords, applying the rule of construction of "ejusdem generis," unanimously held that the insurance policy did not cover the loss. As the result of this decision in the Inchmaree Case, the so-called "Inchmaree" clause was introduced in hull policies. That clause was the second clause beginning with the words, "This insurance also specially to cover," which I quoted near the beginning of this opinion. About 1908, American underwriters broadened the original Inchmaree clause by adding at the end of the particular enumeration of causes of loss the general words, "or other causes of whatsoever nature arising on shore or otherwise." The words embrace all manner of insurable risks. Later on, about 1912, American hull underwriters adopted a new form of policy, commonly known as the "iota" policy, in which the words "or other causes of whatsoever nature arising either on shore or otherwise" were taken out of the Inchmaree clause and inserted in the perils clause, after the word "riots" in the specific enumeration of perils. Such was the first clause of the two extracts from the insurance policies quoted near the beginning of this opinion.

The libelant contends that the damages to the port and starboard boiler are covered by both the perils clause and the Inchmaree clause. In the case of the port boiler it

burst primarily because of the compulsory hydrostatic test required by law. The respondent argues that such an accident was not fortuitous, but caused by the deliberate act of determining whether the boilers would burst under the prescribed pressure. I cannot agree with this reasoning. On the contrary, the test seems to me usual, and the bursting fortuitous and unusual. The boiler had a theoretical strength of 1,000 pounds and a prospective life of double the time of service it had seen.

The real objection to the claim for damages is that the case has no exact judicial precedent; but that objection seems to be insufficient when the perils clause insures against losses from "causes of whatsoever nature arising on shore or otherwise," and the Inchmaree clause expressly insures against "bursting of boilers." The analogy sought to be drawn to the case of Newtown Creek Towing Co. v. Ætna Ins. Co., 163 N. Y. 114, 57 N. E. 302, does not seem sound. There it was held that damage caused by deliberately forcing a vessel through the ice was not covered by a marine policy insuring a vessel against "any accident caused by collision." The vessel was purposely taken through an ice field, in the hope that she would not suffer injury, and did not merely come in contact unexpectedly with floating cakes of ice. Such an impact was held not to be within the nautical definition of a collision.

In the same way in the case of Magnus v. Buttenmer, 11 C. B. 876, damage from a ship's deliberately taking ground on the falling of the tide for convenience in unloading was held neither a stranding nor other peril of the seas, within the terms of an insurance policy. As Maule, J., said: "Nothing has happened which the assured could have wished or anticipated to happen otherwise than it did happen. They intended the ship to take the ground as she did. There was no accident. We are asked, therefore, to assume a loss by perils of the sea when the facts disclosed to us, absolutely negative sea peril." The same reasoning applies to the decision of the House of Lords in Samuel & Co. v. Dumas, [1924] A. C. 431.

In the present case there was no purpose to burst the boilers, but in a test required by the government, and directed by its agents, the unexpected happened. If a spot in the metal weak enough not to stand the strain of the test, though showing no imperfection under any practicable test, be regarded as a defense, neither the sweeping words of the perils clause nor the words "bursting of boilers" in the Inchmaree clause will furnish protection. In almost any conceivable case the insurer can lay as good a foundation for proving that the bursting was from wear and tear, or depreciation, or inherent vice, as it has done by the speculative and tenuous evidence in this case. I think a ground of recovery has been established in the case of the port boiler. The perils clause is an "all risk" clause, and the libelant has discharged his burden when he has proved that the loss was due to a casualty and was caused by some event, as here by the hydrostatic test, covered by the general expressions of the policy. "He is not bound to go further, and prove the exact nature of the accident or casualty which in fact occasioned his loss." British & Foreign Marine Ins. Co. v. Gaunt, [1921] A. C. 41. In the Inchmaree clause the casualty came within a specified risk.

[4, 5] In the starboard boiler, the situation is different. The cracks in this boiler I have found not to be attributable to the bursting of the port boiler. I cannot regard them as brought within the terms "bursting of boilers" in the Inchmaree clause. For some reason, whether from latent defects, wear and tear, or inevitable depreciation I cannot determine, the starboard boiler developed fractures. I cannot say that they were fortuitous, or, if they be regarded as due to latent defects, it has not been proved when such latent defects originated. I only know that they first became evident when the boiler was stripped in May, 1919. It must always be borne in mind that the policies are of *insurance* and not of warranty of soundness, and for that reason no liability arises under the perils clauses for damage to the starboard boiler. The words "other causes of whatsoever nature" cover, in my opinion, "all risks"; but the perils insured against are *risks.*

As Lord Sumner said, in the recent case of British & Foreign Marine Co. v. Gaunt, [1921] 2 A. C. at page 57: "The expression does not cover inherent vice or mere wear and tear. * * * It covers a risk, not a certainty; it is something which happens to the subject-matter from without, not the natural behavior of that subject-matter, being what it is, in the circumstances under which it is carried. Nor is it a loss which the assured brings about by his own act, for then he has not merely exposed the goods to the chance of injury; he has injured them himself. Finally the description 'all risks'

does not alter the general law; only risks are covered which it is lawful to cover, and the onus of proof remains where it would have been on a policy against ordinary sea perils." See, also, Schloss Brothers v. Stevens, [1906] 2 K. B. 665; Grant Smith & Co. v. Seattle Construction & Dry Dock Co., [1920] A. C. 162.

[6] It is contended, however, that the words of the Inchmaree clause insuring against "latent defects" apply. I have already found that no sufficient proof has been made of the existence of latent defects causing the fractures in the starboard boiler. But, assuming that the proof be regarded as sufficient to show latent defects, it in no way indicates that the defects originated during the period covered by either policy. Indeed, any defects in the quality of the metal must have existed from the time the boilers were manufactured, and while they might be brought out by wear and tear, or by severe use during the period covered by the policies, they must have originated long before either policy took effect. The damage insured against in this case was damage "through any latent defect in the machinery." If respondent's theory of latent defects be assumed, the damage was due to the development of flaws which the boilers had long before the policies were taken out. The case of Hutchins Brothers v. Royal Exchange Assurance Corporation, [1911] 2 K. B. 398, is directly in point, and the situation of the starboard boiler closely resembles that of the defective stern frame discovered when the ship Ellaline, involved in that case, was undergoing repairs. The Court of Appeal there held that the cost of renewing the stern frame was not recoverable. Moulton, L. J., in his opinion, said:

"During the currency of the policy, the defect was discovered while the ship was undergoing repairs, and the stern frame was in consequence condemned by Lloyd's surveyors. It is suggested that this was a 'loss or damage to the hull through a latent defect in the hull,' within the meaning of the Inchmaree clause. It was, in my opinion, nothing of the kind. It was not a loss or damage caused by a latent defect, but a latent defect itself. To hold that the clause covers it, would be to make the underwriters not insurers, but guarantors, and to turn the clause into a warranty that the hull and machinery are free from latent defects, and, consequently, to make all such defects repairable at the expense of the underwriters. There are no words in the clause which warrant such an interpretation. The fact that it begins with the word 'insurance' negatives in my opinion the possibility of its being so interpreted."

Both Moulton, L. J., Vaughan Williams, L. J., and Farwell, L. J., agreed with the earlier decision of Walton, J., in Oceanic Steamship Co. v. Faber, 11 Com. Cas. 179. Vaughan Williams, L. J., quotes with approval from that decision the statement that "there must be a latent defect causing loss of or damage to the hull or machinery, and causing that loss of or damage to the hull or machinery during the currency of the policy under which the claim is made. * * * The crack which is the damage, the only damage which is proved, is really nothing but the development of the flaw—that is, of the latent defect. In my opinion the development of a latent defect is not 'damage to the machinery through a latent defect.' In such a case I think the damage is not damage caused by the latent defect, but is the latent defect itself, and nothing more; a latent defect becoming patent is not within the words of this clause, 'damage to the machinery through a latent defect.'"

There was some criticism of the opinion of Walton, J., by the Court of Appeal in Oceanic Steamship Co. v. Faber, 13 Com. Cas. 28, though his decision was affirmed; but it must be regarded as the law of England that there can be no recovery for damage to the starboard boiler, if due to a preexisting latent defect, which became patent from wear and tear or from a cause arising during the currency of the policy which cannot be regarded as accidental. I can find no such accidental cause in the present case. To the same effect is the recent decision of Borland v. Standard Marine Ins. Co., 125 Misc. Rep. 395, 211 N. Y. S. 343, by the Appellate Term of the New York Supreme Court, where Justice McGoldrick followed the opinion of Walton, J., in Oceanic Steamship Co. v. Faber, supra, and the decision of the English Court of Appeal in Hutchins Brothers v. Royal Exchange Assurance Corporation, supra. He refused to follow the only decision to the contrary, which was the old decision by Judge Adams, of this court, in Cleveland & B. Transit Co. v. Insurance Co. of North America, 115 F. 431, as to the interpretation of the words "latent defect" in an Inchmaree clause. That was the earliest of all cases directly bearing upon this question and it may well be doubted whether Judge Adams would have reached the conclusion he did, if the weight of authority and the persuasive arguments which have been presented here

had been available at a time when the Inchmaree clause was comparatively new, and when but few cases had arisen in respect to its interpretation.

[7] Not only does the reasoning of the English decisions seem more convincing, but it is particularly desirable in cases of marine insurance that the decisions of the American and English courts should be in harmony. Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U. S. 487, 44 S. Ct. 175, 68 L. Ed. 402; Borland v. Standard Marine Ins. Co., 125 Misc. Rep. 395, 211 N. Y. S. 348.

[8] In a broad sense I have reached my conclusion, because I regard the damage to the port boiler as due to an accident, while I am not satisfied that the damage to the starboard boiler was due to one. I have followed the English authorities, because I think them right in holding that, even in an "all risk" policy, there must be a fortuitous event—a casualty—to give rise to any liability for insurance.

A decree is granted to the libelant upon the first cause of action for the amount for which the respondent is liable because of damage to the port boiler, but for that amount only. Interest is also allowed upon this sum, but no costs are awarded. The damages arising from the fractures in the starboard boiler are disallowed under both causes of action, and the second cause of action is dismissed.